Imogene MAYFIELD, M. D., a widow, Appellant,

v.

James E. GLEICHERT, M. D., Appellee.

No. 632.

Court of Civil Appeals of Texas, Tyler.

Aug. 31, 1972.

Steves & Bodoin, Robert R. Bodoin, Fort Worth, for appellant.

Thompson, Knight, Simmons & Bullion, Richard E. Gray, Jr., Timothy E. Kelley, John A. Gilliam, Dallas, for appellee.

MOORE, Justice.

This is an appeal from an instructed verdict in favor of the defendant in a libel suit.

Plaintiff, Dr. Imogene Mayfield, brought suit against defendant Dr. James E. Gleichert, alleging that Dr. Gleichert, while acting as Chief of the Department of Obstetrics and Gynecology at the Methodist Hospital in Dallas, made and published certain libelous and slanderous statements against her which resulted in her discharge, removal and expulsion from the staff of the hospital. Defendant denied generally the allegations of the petition and specially denied that he was guilty of malice in making the alleged libelous statements. Defensively, he alleged that the report containing the alleged libelous statements was prepared by him based on information he received as Chief of the Department of Obstetrics-Gynecology and as such was conditionally privileged. Trial was had before the court and jury. After the close of plaintiff's evidence, the trial court sustained the defendant's motion for an instructed verdict. A "take nothing" judgment was entered against plaintiff, Dr. Imogene Mayfield, from which she duly perfected this appeal.

By her first point of error, appellant argues that the trial court erred in instructing a verdict against her because she says the evidence was sufficient to create an issue of fact upon whether a conditional privilege existed. Secondly, she urges that even though the report may have been conditionally privileged, Dr. Gleichert is not entitled to rely upon the privilege as a defense because she says the evidence shows the report was made with malice. She urges that since there was at least some evidence of probative force showing malice on the part of Dr. Gleichert, the trial court erred in instructing a verdict against her. We do not share this view and accordingly overrule appellant's first point of error.

The trial court having sustained defendant's motion for an instructed verdict, we must accept as true the evidence in the record supporting plaintiff's allegations of libel and malice. All conflicts and inconsistencies must be resolved in favor of plaintiff, and we must draw all inferences therefrom most favorable to plaintiff. Hart v. Van Zandt, 399 S.W.2d 791 (Tex.Sup.1965); Constant v. Howe, 436 S.W.2d 115 (Tex.Sup.1968).

The following facts, as disclosed by the record, show the origin and history of the controversy. Plaintiff, Dr. Imogene Mayfield, was a practicing physician in the Oak Cliff area of the City of Dallas, Texas. Approximately seventy-five percent of her practice was devoted to obstetrics. Defendant, Dr. James E. Gleichert, also

practiced medicine in the Oak Cliff area and specialized in the field of obstetrics and gynecology. Both doctors were members of the staff of the Methodist Hospital in Dallas. As a result of certain problems arising in connection with Dr. Mayfield's induction of forced labor in previous child birth cases, the hospital staff promulgated an order prohibiting her from inducing labor in her patients without first obtaining a consultant from the staff to assist her in such cases. Dr. Gleichert did not have anything to do with the staff's decision requiring Dr. Mayfield to obtain a consultant in such cases and she does not so contend. The events which occasioned the alleged libelous publication arose out of the treatment of Mrs. Billy Green, one of plaintiff's maternity patients, who was admitted to the Methodist Hospital on June 4, 1962. Prior to the time of Mrs. Green's admission, Dr. Mayfield had determined that Mrs. Green's symptoms were such that forced labor would be necessary. When Mrs. Green arrived at the hospital, Dr. Mayfield, in accordance with the staff order, contacted Dr. Harwin B. Jamison, a member of the staff, and requested him to act as her consultant. Shortly after Mrs. Green's admission to the hospital, her condition deteriorated drastically. Dr. Jamison prescribed a certain drug which was administered to her. Dr. Mayfield delivered the child. Shortly after being put in the recovery room, Mrs. Green had heavy uterine bleeding and went into shock. Dr. Jamison recommended a continuation of the same drug which the patient had been receiving. At this point a bitter controversy arose between Dr. Mayfield and Dr. Jamison as to whether or not her condition was caused by the use of the drug. After Mrs. Green recovered, Dr. Jamison reported the incident to Dr. Gleichert and complained of what he considered to be unethical conduct on the part of Dr. Mayfield in bitterly criticizing the method of treatment to Mrs. Green and her family as well as the general public. As a result of the complaint, Dr. Gleichert, on June 13, 1962, called a meeting of some of the members of the staff, including Dr. Mayfield, for the purpose of discussing the treatment of Mrs. Green and the alleged unethical conduct on the part of Dr. Mayfield. During this meeting Dr. Mayfield was advised that she had publicly maligned and injured Dr. Jamison. Subsequently, on June 21, 1962, at a meeting of the staff of the Obstetrical and Gynecological Department, several of the members indicated that they would no longer act as a consultant for Dr. Mayfield because of their fear of a repetition of what happened in the Green case. As a result of this meeting, a motion was made to recommend that Dr. Mayfield not be reappointed to the staff at the end of the year. Dr. Gleichert was instructed to investigate, compile and present the facts surrounding the Green incident. On August 24, 1962, there was a joint meeting of the executive committee of the medical staff and the executive committee of the Obstetrical and Gynecological Department at which time Dr. Gleichert orally reported regarding the alleged unethical conduct of Dr. Mayfield. Dr. Mayfield was invited to this meeting and was in attendance. She was given an opportunity to answer the charges and proceeded to deny them categorically. On August 31, 1962, there was another meeting of the executive committee at which time Dr. Gleichert was appointed to represent the staff in presenting its report of Dr. Mayfield's activities to the general medical staff at the annual meeting on September 10, 1962. Prior to the meeting of the general medical staff on September 10, 1962, Dr. Gleichert prepared a written report. He testified that the report was delivered orally before the general staff. The report, which is the basis of the plaintiff's cause of action, reads in part as follows:

"Report prepared by Dr. James E. Gleichert, Chief, Department of Obstetrics-Gynecology regarding Dr. Imogene Mayfield for presentation at the medical Staff Meeting on September 10, 1962.

"The recommendation for the expulsion of a doctor from the staff of a gen-

eral hospital is a serious step. The cancellation of a physician's privileges on an attending staff is a move not to be lightly undertaken. It is with these facts in mind that the Department of Obstetrics-Gynecology has presented to the Executive Committee of Methodist hospital, the recommendation that the privileges of Dr. Imogene Mayfield be suspended.

"This step was taken by the Department after careful consideration, after patient attempts to arrive at a modus vivendi, after a period of cooling off and most important, after repeated problems had arisen and after careful and due warning had been issued.

　＊　　＊　　＊　　＊　　＊　　＊

"One of the most damaging things that one physician can do to another physician, and to the entire profession, is to offer criticism of that physician to the laity. This is true at all times, but is terribly true in time of emergency.

"The complaint of the Obstetrics-Gynecology Department is that during such a time of extreme emergency, Dr. Mayfield did offer, to the family of the patient, and to the public in general, bitter criticism of a man whom she had voluntarily chosen as her consultant. This criticism was at first offered in a time of extreme stress when the life of the patient was in jeopardy. This is the worst possible time to be critical.

"The criticism and degradation was repeated, was furthered in subsequent days, and was spread more widely out of the circle of the family of the patient, to other patients in the hospital, the friends and neighbors of the patient.

"Obviously, this was damaging to the consultant. Less obvious, but equally true, is the fact that this was damaging to the Department of Obstetrics-Gynecology, to Methodist Hospital, to the medical profession as a whole, and finally to you, as an individual physician.

"In the case in question, Dr. Mayfield admitted to the Labor Section, a Mrs. Green, on June 4, 1962 at 2:00 a. m. At 2:30 a. m., she asked Dr. Jamison, who was in the Labor Section, for a consultation. Dr. Jamison saw and examined this patient, made his recommendations on a consultation sheet, and these recommendations were followed by Dr. Mayfield. There is, on this patient's chart, a second consultation sheet made out by Dr. Mayfield to Dr. Jamison, dated June 5, at 10:30 a. m. Dr. Jamison made further recommendations on this second sheet, which were followed by Dr. Mayfield.

"At 3:10 p. m. on June 5, Mrs. Green delivered. As she was put on the delivery table, Dr. Jamison was again called. He came immediately to the Delivery Room, leaving a patient in his treatment room, offered his help at the delivery, to Dr. Mayfield. This was declined. Dr. Jamison remained on hand and at the termination of the delivery recommended a continuation of I.V. Pitocin which the patient had been receiving, on and off, for 36 hours. This was not done. Shortly after being put in the OB Recovery Room, Mrs. Green had heavy uterine bleeding and went into shock. Dr. Mayfield called Dr. Jamison back to the hospital. He again came and upon entering the Recovery Room observed the situation as described above. At this time, Dr. Mayfield said to him, 'look what you have done; you have killed my patient.'

"Dr. Jamison started indicated emergency treatment on the patient, during which time Dr. Mayfield offered further critical comment. During this time, Dr. Mayfield was completely distraught, being reduced from effective action to ineffective panic. Dr. Jamison took Dr. Mayfield to the Doctors' Chart room and explained the patient's problem to her and its gravity, then asked, 'Do you want

me to treat her?' Dr. Mayfield replied, 'You had better, you got her in this shape.'

"Dr. Jamison returned to the care of the patient; Dr. Mayfield to the Visitors' Alcove and Mr. Green, thence with Mr. Green to the Coffee Shop. During this time, Dr. Mayfield told Mr. Green that Dr. Jamison, described by her as being young, without sufficient training and with no where near the experience that she had, had interfered in the case, had forced Dr. Mayfield to give a drastic overdosage of a medication which she (Dr. Mayfield) blamed for the patient's present critical state. She stressed that Dr. Jamison had pushed her aside in the handling of the case, had gone against her wishes and had now 'thrown her out of the Recovery Room.' She implied that if Mrs. Green's death ensued, the responsibility would be Dr. Jamison's. She attributed this action to a general jealousy on the part of the Ob-Gyn Staff toward her, of restrictions imposed on her and the general practitioners of the Ob-Gyn Staff which were part of an effort to drive them out of obstetrics. Her language during this conversation was profane, obscene and abusive.

"When one of the Nursing Staff entered the Coffee shop, Dr. Mayfield pointed her out to Mr. Green as the one who had refused to secure or administer medication which Dr. Mayfield ordered.

"Following a phone call from Dr. Jamison, Dr. Mayfield reported improvement in Mrs. Green's condition, laying credit for the improvement on 20 cc of calcium gluconate which she had given and giving no credit for I.V. Ringers, Pitocin and whole blood administered by Dr. Jamison.

"After this, Dr. Mayfield took Mr. Green to the hospital library where she pointed out in the Pharmocology test the toxic properties of Magnesium Sulfate.

\*      \*      \*      \*      \*      \*

"When Mrs. Green recovered consciousness, she said to her husband, 'I almost died.' The husband replied, 'Yes, that doctor almost killed you, but Dr. Mayfield was here and pulled you through.'

"Mr. Green, while in the Coffee Shop, threatened to kill Dr. Jamison and was restrained by Dr. Mayfield, who gave as a reason for desisting the fact that she was already in trouble with the hospital over an incident of last year.

\*      \*      \*      \*      \*      \*

"On the 13th day of June, Dr. Jamison received a letter from Dr. Mayfield which contained an admission and apology for 'Unprofessional Conduct' and blamed prior restrictions placed on her as a reason for the resentment which initiated the dispute about Mrs. Green.

"Several members of the Ob-Gyn Staff came to me later and expressed their unwillingness to act as Dr. Mayfield's consultants in the future, stating that they feared lawsuit as the ultimate result. A special meeting of the Ob-Gyn Staff was requested by one of the members.

"At this meeting, I asked for volunteers who would act as consultants for Dr. Mayfield. No one volunteered.

\*      \*      \*      \*      \*      \*

"Since cases requiring consultation are problems to begin with, the possibilities of an unfavorable outcome or at least bad moments are increased. Based on the pattern of past behavior, the chances of public criticism and/or lawsuit or personal violence are unpleasantly increased. Dr. Jamison is being sued at the present time by Mr. Green for $70,000.00.

"To complete your knowledge of the background of this case, I will mention

previous episodes which have posed a problem:

"1. Dr. Moody had to make Dr. Mayfield stop having residents ghost operate on cesarean section patients and was accused by her of preventing her from making a living. (He was Chief of the Dept. in 1954–55).

"2. Dr. Cobb did her Cesarean Sections for a time and was accused of tearing a hole in the bowel.

"3. Dr. Stayer was accused of causing diarrhea and of keeping a baby in the hospital longer than required after treatment for meningitis.

"4. Dr. Gene Lindsey (past chief resident) had some problems regarding postpartum hemorrhage. This resulted in the termination of house staff services for Dr. Mayfield.

"5. Dr. Henderson, as Chief of Ob-Gyn had the problem in 1961 of unprofessional conduct in a difficult labor and delivery, and of improper regard of Dr. Frank Knopp, a consultant. This case reached the County Grievance Committee.

"6. Dr. Philip D. Newell, who had done most of Dr. Mayfield's consultations, was finally attacked and blamed because a patient was sectioned. This patient died 20 days post-operatively.

\* \* \* \* \* \*

"I was directed by the Executive Committee to bring to you a report of this action and of the problems which prompted it.

\* \* \* \* \* \*

James E. Gleichert, M.D.
Chief, Department of
Obstetrics-Gynecology"

Upon the trial Dr. Gleichert testified that after making an investigation and trying to "gather up the facts" surrounding the Green incident, he compiled the foregoing report. He testified unequivocally that he believed the information he received and reported was true and that he never at any time had any conscience doubts concerning its truthfulness. Dr. Mayfield, testifying in her own behalf, categorically denied that she ever made any statements criticizing Dr. Jamison and that the statements and remarks attributed to her in the report were untrue.

The essential elements of a conditional or qualified privilege are stated in 50 Am. Jur.2d, Libel and Slander, Sec. 195, p. 698, as follows:

"Conditional or qualified privilege is based on public policy. It does not change the actionable quality of the words published, but merely rebuts the inference of malice that is imputed in the absence of privilege, and makes a showing of falsity and actual malice essential to the right of recovery.

"A qualified or conditionally privileged communication is one made in good faith on any subject matter in which the person communicating has an interest, or in reference to which he has a right or duty, if made to a person having a corresponding interest or duty on a privileged occasion and in a manner and under circumstances fairly warranted by the occasion and duty, right, or interest. The essential elements thereof are good faith, an interest to be upheld a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only. The privilege arises from the necessity of full and unrestricted communication concerning a matter in which the parties have an interest or duty. The transmitter must have an interest or duty in the subject matter, and the addressee must have a corresponding interest or duty, but such duty may be moral or social, rather than a legal one. \* \* \*"

In Section 198 of the foregoing authority, it is stated:

"In the absence of malice, and if there has been no abuse of a privilege occasion, the defense of conditional or qualified privilege may extend to a communication that is false, even though it charges a crime. Indeed, it has been said that the doctrine of privilege rests usually, if not always, on the assumption that the words were untrue, but were excused by the occasion and the circumstances. * * * "

Similar statements may be found in 36 Tex.Jur.2d, Libel and Slander, Secs. 57, 59, 71, 75–6, 79, 80 and 90–2 (1962).

■ The question of whether a conditional or qualified privilege exists is a question of law to be decided by the trial court. See Johns v. Associated Aviation Underwriters, 203 F.2d 208 (5th Cir., 1953); Cranfill v. Hayden, 22 Tex.Civ. App. 656, 55 S.W. 805 (1900); Fitzjarrald v. Panhandle Pub. Co., 149 Tex. 87, 228 S. W.2d 499 (1950).

■ As we view the record, the undisputed facts show that Dr. Gleichert had an interest in the subject matter of the report as a member of the medical staff of Methodist Hospital and Chief of the Obstetrical and Gynecological Department. Moreover, he had a duty to make the report because he was requested by the staff to prepare such report. The only persons to whom he communicated the report were other members of the medical staff of Methodist Hospital, i. e., people having a corresponding interest in the subject matter. Thus, the facts clearly support the trial court's implied conclusion that Dr. Gleichert's report was conditionally or qualifiedly privileged, and, therefore, not actionable in the absence of evidence of actual malice. 20 A.L.R.2d 574, sec. 24.

■ Where the evidence establishes that the publication alleged was made under circumstances creating a conditional or quali-

fied privilege as here, plaintiff has the burden of proving that the publication was made with malice or a want of good faith in order to establish a cause of action. Buck v. Savage, 323 S.W.2d 363 (Tex.Civ. App., Houston, 1959, ref., n. r. e.); Cheatwood v. Jackson, 442 S.W.2d 789 (Tex. Civ.App., Houston, 1969); 50 Am.Jur.2d sec. 195, p. 698.

In the case of International & G.N.R. Co. v. Edmundson, 222 S.W. 181, (Tex. Com. of App., 1920), the court describes the kind of malice required:

"The malice which avoids the privilege is actual or express malice, existing as a fact at the time of the communication, and which inspired or colored it. Such malice exists where one casts an imputation which he does not believe to be true, or where the communication is actuated by some sinister or corrupt motive or motives of personal spite or ill will or where the communication is made with such gross indifference to the rights of others as will amount to a willful or wanton act."

■ Dr. Mayfield contends that the evidence is sufficient to raise the issue of malice because she says there is some evidence showing that the report was actuated by sinister or corrupt motives and was made with gross indifference to her rights. In this connection, she suggests that since the evidence shows that Dr. Gleichert and Dr. Jamison were partners in a large medical partnership known as the Physicians and Surgeons Clinic, Dr. Gleichert probably felt that her criticism of his partner damaged the reputation of their clinic and therefore he prepared the report because of spite or ill will toward her. Insofar as we have been able to determine, this conclusion is mere supposition and is not supported by any evidence in the record. In this connection it must be remembered that Dr. Gleichert did not volunteer the report. He prepared it only because of the request of the hospital staff. There is nothing in the evidence to suggest that he initiated

the proceedings or ever voted in favor of recommending her expulsion. As we view the record there is nothing to suggest malice by reason of sinister or corrupt motives.

■ Plaintiff further contends that a statement made by Dr. Gleichert at the June 13th meeting that he had a lot of influence and if he ever heard mention of the Green case again, he would see that she was put out of everything constituted some evidence of malice. As we view the statement, it amounts to nothing more than a warning. Dr. Gleichert, as head of the department, merely warned her that if she did not stop criticism of Dr. Jamison, some action would be taken. There is nothing in the evidence showing that she ever did or said anything subsequent to this time that would cause Dr. Gleichert to become angry or vindictive. The only reason for his subsequent action in preparing the report was because of the request of the staff and the executive committee. The warning was made some two months before Dr. Gleichert published the report on September 10, 1962, and thus would not tend to constitute evidence of actual malice at the time of the publication. The evidence from which a jury may infer malice must have existed at the time of the publication and must have actuated it. International & G.N.R. Co. v. Edmundson, supra.

■ Plaintiff further contends that the defendant's malicious intent or gross indifference is evidenced by his failure to investigate the truth or the falsity of statements made in the report before publishing it. In El Paso Times, Inc. v. Trexler (Tex. Sup., 1969), 447 S.W.2d 403, the Supreme Court held: "Failure to investigate the truth or falsity of a statement before it is published has been held insufficient to show actual malice. Negligence or failure to act as a reasonably prudent man is likewise insufficient." It is likewise the rule that malice on the part of the defendant cannot be inferred from the falsity of the

statement alone. Buck v. Savage, supra; Jenkins v. Taylor, 4 S.W.2d 656 (Tex.Civ. App., Austin, 1928, writ dis.); Cheatwood v. Jackson, 460 S.W.2d 528 (Tex.Civ.App., Houston, 1970 ref., n. r. e.), citing cases.

■ The essential issue in making a determination as to the presence of malice on the part of the defendant is the issue of whether the defendant believes the truth of the conditionally privileged communication. "If one makes a statement, believing it to be true, he would not lose the protection arising from the privileged occasion, although he had no reasonable ground for his belief." International & G.N.R. Co. v. Edmundson, supra.

Upon a review of the record, we are convinced that the report in question was based entirely upon information furnished to defendant by Dr. Jamison and others; that defendant believed the statements made by him in the report to be true and that the same were published without any ill feeling or malice toward plaintiff. As we view the record, the evidence fails to raise the issue of malice.

■ By her second point appellant complains of the action of the trial court in excluding evidence of certain By-Laws of the Methodist Hospital. The proffered By-Laws provided (1) that the membership and credential committee shall have the duty of investigating any breach of ethics that may be reported and (2) that a member of the staff who has attended a case that is to be presented for discussion at any meeting shall be notified and shall be required to be present. Appellant asserts that since Dr. Gleichert did not follow the By-Laws of the hospital, his report was not privileged. We fail to see the relevancy of the hospital By-Laws. If the expulsion procedure was such as to deny her due process, it was not caused by Dr. Gleichert. He had nothing to do with the proceedings other than to present his report to the general hospital staff. He did

**628**

not conduct the proceedings resulting in her expulsion. The proceedings were conducted by officials of the general staff and officials of the executive committee. If appellant was wrongfully expelled, it was a result of the doings of the general staff and not Dr. Gleichert. The fact that the general staff and the officers thereof may not have afforded her due process would amount to no proof that Dr. Gleichert made his in bad faith. We fail to see the materiality of the By-Laws and therefore overrule the second point of error.

▆ Appellant also complains of the trial court's action in excluding her testimony regarding the efficacy of Mrs. Green's treatment and the conflict in recommended treatment between appellant and Dr. Jamison. As we understand the record, Dr. Gleichert's report as to appellant's improper treatment of Mrs. Green was based upon a report he received from Dr. Jamison. There is nothing to show that Dr. Gleichert acted in bad faith in accepting such report and relying thereon. The fact that Dr. Mayfield and other doctors might of had opinions contrary to that of Dr. Jamison as to the method of treatment would not constitute proof of bad faith on the part of Dr. Gleichert. Failure to investigate the truth or falsity of a statement before it is published has been held insufficient to show actual malice. International & G.N.R. Co. v. Edmundson, supra. Appellant's third and fourth points are overruled.

▆ Finally appellant complains of the exclusion from the record of two medical charts relating to the treatment of Mrs. Green. Appellant argues that. if Dr. Gleichert had investigated these charts he would have determined that she prescribed certain drugs and whole blood which Dr. Jamison said were not administered and that Dr. Jamison's report to the contrary was false. Appellant argues that his failure to investigate in this respect constitutes some evidence of malice. We do not agree

and accordingly overrule the fifth point based upon the authorities hereinbefore cited.

The judgment of the trial court is affirmed.