ST. LUKE'S EPISCOPAL HOSPITAL, Petitioner,

v.

Comfort and Kingsley AGBOR, Respondents.

No. 96–0085.

Supreme Court of Texas.

Argued Oct. 2, 1996.

Decided June 20, 1997.

Rehearing Overruled Oct. 30, 1997.

Solace H. Kirkland, Michael O. Connelly, Houston, for Petitioner.

Phillip A. Pfeifer, Houston, for Respondents.

GONZALEZ, Justice, delivered the opinion of the Court, in which HECHT, ENOCH, OWEN and BAKER, Justices, join.

This is an appeal from a summary judgment. The sole issue in this case is whether the Texas Medical Practice Act ("the Texas Act") applies to a patient's cause of action against a hospital for its credentialing activities. We hold that it does, and reverse the judgment of the court of appeals.

## I

Dr. Suzanne Rothchild delivered Dikeh Agbor at St. Luke's Episcopal Hospital in Houston. During birth, the baby suffered an injury that permanently disabled his left arm. The baby's parents, Comfort and Kingsley Agbor, sued Dr. Rothchild for medical malpractice, and St. Luke's for negligent and grossly negligent credentialing. The Agbors allege that the hospital should not have renewed Dr. Rothchild's staff privileges because she had been the subject of many medical malpractice cases, some involving St. Luke's, she was not a Texas resident, and was not properly insured for medical malpractice. St. Luke's moved for summary judgment asserting that the Texas Act, TEX. REV.CIV. STAT. ANN. art. 4495b, §§ 1.01–6.13, provides immunity for credentialing decisions by health care entities absent a showing of malice. The trial court granted the hospital's motion and severed this action against St. Luke's from the action against Dr. Roth-

child. The court of appeals, with one justice dissenting, reversed and held that the trial court incorrectly interpreted the Texas Act to require a showing of malice in credentialing actions brought by patients. 912 S.W.2d 354.

## II

■ The Texas Act provides, in pertinent part, as follows:

> (*l*) A cause of action does not accrue against the members, agents, or employees of a medical peer review committee or against the health-care entity from any act, statement, determination or recommendation made, or act reported, **without malice**, in the course of peer review as defined by this Act.
>
> (m) A person, health-care entity, or medical peer review committee, that, **without malice**, participates in medical peer review activity or furnishes records, information, or assistance to a medical peer review committee or the board is immune from any civil liability arising from such an act.

Tex.Rev.Civ. Stat. Ann. art. 4495b, § 5.06(*l*), (m) (emphasis added). "Medical peer review committee" means "a committee of a health-care entity ... authorized to evaluate the quality of medical and health-care services or the competence of physicians." *Id.* § 1.03(a)(6). "Medical peer review" means "the evaluation of medical and health-care services, including evaluation of the qualifications of professional health-care practitioners and of patient care rendered by those practitioners." *Id.* § 1.03(a)(9). The definitions of "medical peer review committee" and "medical peer review" clearly contemplate, among other things, the process known as "credentialing"—the granting or retention of a doctor's hospital privileges.

St. Luke's argues that the plain language of section 5.06(*l*) and (m) bars an action based on a hospital's credentialing decision made without malice, regardless of whether the plaintiff is a doctor who was the subject of the decision, or a patient who was injured by a doctor who allegedly should not have been credentialed. The Agbors argue that section 5.06 should be construed narrowly to protect peer review participants from suits by physicians and not from patients' negligent credentialing actions.

■ When a statute is clear and unambiguous, courts need not resort to rules of construction or extrinsic aids to construe it, but should give the statute its common meaning. *Bridgestone/Firestone, Inc. v. Glyn–Jones,* 878 S.W.2d 132, 133 (Tex.1994); *One 1985 Chevrolet v. State,* 852 S.W.2d 932, 935 (Tex.1993). The Legislature's intent is determined from the plain and common meaning of the words used. *Monsanto Co. v. Cornerstones Mun. Util. Dist.,* 865 S.W.2d 937, 939 (Tex.1993); *Moreno v. Sterling Drug, Inc.,* 787 S.W.2d 348, 352 (Tex.1990). This Court has reiterated these principles many times. In *RepublicBank Dallas, N.A. v. Interkal, Inc.,* 691 S.W.2d 605, 607 (Tex. 1985), we stated:

> Courts must take statutes as they find them. More than that, they should be willing to take them as they find them. They should search out carefully the intendment of a statute, giving full effect to all of its terms. But they must find its intent in its language and not elsewhere.... They are not responsible for omissions in legislation. They are responsible for a true and fair interpretation of the written law. It must be an interpretation which expresses only the will of the makers of the law, not forced nor strained, but simply such as the words of the law in their plain sense fairly sanction and will clearly sustain.

*Id.* (quoting *Simmons v. Arnim,* 110 Tex. 309, 220 S.W. 66, 70 (1920)). The court of appeals held that the Texas Act does not unambiguously state that a hospital is immune from liability in all cases for credentialing decisions absent a showing of malice. 912 S.W.2d at 357. We disagree.

The Texas Act expressly provides that "[a] cause of action does not accrue ... against the health-care entity from any ... determination or recommendation made ... without malice, in the course of peer review as defined by this Act"; and "[a] ... health-care entity ... that, without malice, participates in medical peer review activity ... is immune

from any civil liability arising from such an act." TEX.REV.CIV. STAT. ANN. art. 4495b, § 5.06(*l*), (m). The statute defines "medical peer review" to include "evaluation of the qualifications of professional health-care practitioners...." *Id.* § 1.03(a)(9). Thus, the plain meaning of the words used provides immunity from civil liability to a health-care entity for actions in the course of peer review, when such actions are done without malice.

The Agbors argue that because the statute only allows a lawsuit for acts committed with malice, the Legislature did not intend it to apply to patients' suits. They contend that malice requires proof of "spite, ill will, or intent to injure," which must be directed toward a known individual. The argument is that a plaintiff could never prove that a credentialing body acted with malice toward a specific patient. However, the Texas Act states that "[a]ny term, word, word of art, or phrase that is used in this Act and not otherwise defined in this Act has the meaning as is consistent with the common law." TEX.REV. CIV. STAT. ANN. art. 4495b, § 1.03(b). Under the common law, proof of malice does not necessarily require conduct directed toward a specific person. *See Shannon v. Jones,* 76 Tex. 141, 13 S.W. 477, 478 (1890) (defining malice as a reckless disregard for the rights of others).

In fact, the Legislature itself has recently defined "malice" for the purpose of recovery of exemplary damages, and that definition does not require an act directed toward a specific person. In the Civil Practice and Remedies Code, the Legislature defines "malice" as:

(A) a specific intent by the defendant to cause substantial injury to the claimant; **or**

(B) an act or omission:

(i) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

(ii) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

TEX. CIV. PRAC. & REM.CODE § 41.001(7) (emphasis added). Considering the Legislature's pronouncement that "malice" need not be directed toward a specific individual in the context of exemplary damages, it does not follow that in the context of peer review, the committee must necessarily act with malice toward a specific patient for that patient to prove his or her case. Therefore, the fact that the Legislature chose to allow suits only for malicious conduct in no way dictates that the statute does not apply to patients' claims.

The Agbors further contend that the Texas Act does not compel the result we reach because when the Legislature enacted the Act, it incorporated the Health Care Quality Improvement Act of 1986 ("the Federal Act"), 42 U.S.C. §§ 11101–52, and such an interpretation would render the Acts inconsistent with each other. The Federal Act states as follows:

Nothing in this chapter shall be construed as affecting in any manner the rights and remedies afforded patients under any provision of Federal or State Law to seek redress for any harm or injury suffered as a result of negligent treatment or care by any physician, health care practitioner, or health care entity, or as limiting any defense or immunities available to any physician, health care practitioner, or health care entity.

*Id.* § 11115(d). The Agbors contend that because the Federal Act is incorporated into the Texas Act, section 11115(d) dictates that neither Act affects patients' suits, including suits for negligent credentialing. They argue such a suit is one for "negligent treatment or care by ... [a] health care entity," *id.,* which the Federal Act expressly does not affect. Under the Agbors' view, if the Texas Act provides immunity absent malice in credentialing decisions, it will directly conflict with the Federal Act. This argument fails to persuade us.

First, it is debatable whether a hospital's alleged acts in credentialing physicians are themselves part of the "treatment and care" of patients. *See* Richard L. Griffith & Jor-

dan M. Parker, *With Malice Toward None: The Metamorphosis of Statutory and Common Law Protection for Physicians and Hospitals in Negligent Credentialing Litigation*, 22 TEX. TECH L.REV. 157, 183 n. 146 (1991) (stating that credentialing impacts, but is not an actual part of, "treatment and care"). We note that the court of appeals' interpretation of section 11115(d) is based on an improperly broad reading. The court stated that the Federal Act "provides that it does not affect the rights and remedies available to a patient for the negligence of a physician, health-care provider or health-care entity." 912 S.W.2d at 358. This reading ignores the limitation that the patients' suits unaffected by the Federal Act are those for "negligent **treatment or care**," not merely negligence in general, which undoubtedly would include negligent credentialing. 42 U.S.C. § 11115(d) (emphasis added).

Second, the Federal Act also provides:

Except as specifically provided in this subchapter, nothing in this subchapter shall be construed as changing the liabilities or immunities under law or as preempting or overriding any State law which provides incentives, immunities, or protection for those engaged in a professional review action that is in addition to or greater than that provided by this subchapter.

42 U.S.C. § 11115(a). Therefore, even if the Federal Act does not apply to negligent credentialing as the Agbors argue, this provision specifically allows states to implement their own initiatives to provide greater immunities in professional review actions than those the Federal Act provides. No provision of the Federal Act overrides or preempts a state's efforts in this area. Texas has clearly done what section 11115(a) allows and has provided extra "immunities, or protection for those engaged in a professional review action." *Id.* By these express terms, no conflict arises between the two acts; thus, the existence of the Federal Act does not compel a departure from the plain meaning of the Texas Act.

The Agbors also rely on this Court's decision in *Bridgestone/Firestone*, which stands for the principle that a statutory provision must be construed in the context of the entire statute of which it is a part. *Bridge-*

*stone/Firestone*, 878 S.W.2d at 133. The statutory provision in that case stated, "Use or nonuse of a safety belt is not admissible evidence in a civil trial." TEX.REV.CIV. STAT. ANN. art. 6701d, § 107C(j), *repealed by* Acts 1995, 74th Leg., ch. 165, § 24(a), 1995 Tex. Gen. Laws 1870, 1871 (current version at TEX. TRANSP. CODE § 545.413(g)). This provision was part of the Uniform Act Regulating Traffic on Highways. It was intended to clarify that the sole legal sanction for failure to wear a seat belt is the criminal penalty provided by the statute, and that such a failure could not be used against the injured person in a civil trial. *Bridgestone/Firestone*, 878 S.W.2d at 134. The defendants in the case argued that the provision should also be read to abolish crashworthiness actions against seat belt manufacturers. The Court disagreed, holding that the meaning of the provision became clear if read consistently with the context of the entire statute. The Court concluded that the Legislature simply could not have intended to create a wholesale exemption from suit in a subsection of a traffic regulation. *Id.*

The provisions creating peer review immunity are consistent with the rest of the statute in which they are found. In contrast to the traffic statute in *Bridgestone/Firestone*, which had no apparent application to a products liability suit for defective seat belts, the statute in the present case is part of the "Medical Practice Act," which deals broadly with "regulating the practice of medicine." TEX.REV.CIV. STAT. ANN. art. 4495b, §§ 1.01, 1.02(4). The Texas Act directly concerns immunity from suit for those participating in medical peer review activity. *Id.* § 5.06(*l*), (m). The context of the statute as a whole involves precisely the situation in this suit—regulating the practice of medicine, including "evaluation of the qualifications of professional health-care practitioners." *Id.* § 1.03(a)(9). In such a case, we give the statute's words their common meaning, and the Agbors' reliance on *Bridgestone/Firestone* is misplaced.

### III

■ In the court of appeals, the Agbors also complained that affording hospitals im-

munity from negligent credentialing actions absent malice violates the Open Courts Provision of the Texas Constitution. *See* Tex. Const. art. I, § 13. Because it disposed of the Agbors' claims solely on statutory construction, the court of appeals expressly reserved this issue. In this Court, both parties have briefed the issue, and for the sake of judicial economy, we consider the question instead of remanding it for the court of appeals' consideration. *See First Baptist Church v. Bexar County Appraisal Review Bd.*, 833 S.W.2d 108, 111 (Tex.1992).

▪ The Open Courts Provision of the Texas Constitution provides, in pertinent part: "All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law." Tex. Const. art. I, § 13. To demonstrate that a statute violates this constitutional guarantee, a litigant must show 1) that the statute restricts a well-recognized common law cause of action, and 2) that the restriction is unreasonable or arbitrary when balanced against the purpose of the statute. *Baptist Mem'l Hosp. Sys. v. Arredondo*, 922 S.W.2d 120, 121 (Tex.1996); *Moreno v. Sterling Drug, Inc.*, 787 S.W.2d 348, 355 (Tex.1990). This Court has consistently held that the Open Courts Provision protects only well-defined common law causes of action from legislative restriction. *See Moreno*, 787 S.W.2d at 356–57.

We have never dealt with the question of whether a common-law cause of action exists for negligent credentialing. In 1987, when the Legislature enacted the Texas Act's immunity provisions, only two Texas courts had considered the question, reaching opposite results. *See Park North Gen. Hosp. v. Hickman*, 703 S.W.2d 262, 264–66 (Tex.App.—San Antonio 1985, writ ref'd n.r.e.); *Jeffcoat v. Phillips*, 534 S.W.2d 168, 172–74 (Tex.Civ. App.—Houston [14th Dist.] 1976, writ ref'd n.r.e.). *Park North* upheld a cause of action for negligent credentialing and determined that a hospital has a duty to a patient to exercise reasonable care in the selection of its medical staff and in granting privileges to them. *Park North*, 703 S.W.2d at 266. On the other hand, *Jeffcoat* held that absent an employer-employee, principal-agent, partner-

ship, or joint venture relationship between a hospital and physician, a hospital is not liable for its credentialing decisions where the patient chooses the physician. *Jeffcoat*, 534 S.W.2d at 173.

In short, when the Legislature enacted the Texas Act's immunity provisions, the lower courts were split on the existence of a cause of action for negligent credentialing, and we had not considered the question. Therefore, we cannot conclude that negligent credentialing was a well-recognized common law cause of action. Thus, the Agbors have failed to show an open courts violation. Because it is not necessary to our disposition of this case, we reserve for another day whether we recognize a common-law cause of action for negligent credentialing.

The dissenting Justices refer to a number of other jurisdictions that recognize in varying degrees a duty to exercise care in credentialing activities. However, their opinions do not indicate whether those negligent credentialing causes of action are based on the common law, or whether they involve restrictions identical, or even similar, to the statutory language that limits our decision. As Chief Justice Phillips acknowledges, at least one court has held that a similar statute enacted to encourage hospitals to actively engage in peer review barred a claim against a medical care facility under a corporate negligence theory for its credentialing decisions involving an independent contractor physician. *See Lemuz v. Fieser*, 261 Kan. 936, 933 P.2d 134, 140, 145 (1997); *McVay v. Rich*, 255 Kan. 371, 874 P.2d 641, 645 (1994). The Kansas statute provides:

> There shall be no liability on the part of ... any licensed medical care facility because of the rendering of or failure to render professional services within such medical care facility by a person licensed to practice medicine and surgery if such person is not an employee or agent of such medical care facility.

Kan. Stat. Ann. § 65–442(b) (1995). The Kansas Supreme Court concluded that regardless of the reasons favoring liability under a corporate negligence theory, it simply cannot reach the question because the clear, unambiguous language of the statute bars a

patient's claims against a hospital for credentialing or recredentialing activities. *See* *McVay,* 874 P.2d at 645. The same is true in our case. The Legislature is free to set a course for Texas jurisprudence different from other states'. Once the Legislature announces its decision on policy matters, we are bound to follow it within constitutional bounds.

Accordingly, we hold that the Texas Act's immunity provisions prescribe a threshold standard of malice to state a cause of action against a hospital for its credentialing activities.[1] Further, this standard does not violate the Open Courts Provision of the Texas Constitution.

For the above reasons, we reverse the judgment of the court of appeals and render judgment that the Agbors take nothing from St. Luke's Hospital.

ABBOTT, Justice, not sitting.

PHILLIPS, Chief Justice, delivered a dissenting opinion, joined by SPECTOR, Justice.

The issue before us is whether a patient has a cause of action against a hospital for negligent credentialing. Because I conclude that the common law of Texas recognizes such a cause of action and that nothing in the Texas Medical Practice Act ("TMPA") or any other statute takes it away, I respectfully dissent.

I

A hospital's duty to exercise care in the treatment of patients, including its credentialing activities, was first recognized in this state in *Park North Gen. Hosp. v. Hickman,* 703 S.W.2d 262 (Tex.App.—San Antonio 1985, writ ref'd n.r.e.). This cause of action was also recognized in *Lopez v. Central Plains Reg. Hosp.,* 859 S.W.2d 600 (Tex. App.—Amarillo 1993, no writ) (holding that a material issue of fact about whether a hospital negligently credentialed a doctor precluded summary judgment). *See also Smith v. Baptist Mem. Hosp. Sys.,* 720 S.W.2d 618, 626 n. 2 (Tex.App.—San Antonio 1986, writ ref'd n.r.e.) (a hospital "clearly may have a duty to prevent a physician's malpractice at least to the extent that it establishes procedures for the granting of staff privileges and for the review of these privileges.").

The duty is separate from a hospital's vicarious or respondeat superior liability.[1] *See generally Smith,* 720 S.W.2d at 626. It includes the duty to exercise care in its recredentialing functions. *See Park North,* 703 S.W.2d at 266. Twenty-seven other jurisdictions have recognized the duty in varying degrees. *See, e.g., Humana Med. Corp. v. Traffanstedt,* 597 So.2d 667 (Ala.1992) (recognizing duty but finding no liability under particular facts); *Storrs v. Lutheran Hosps. & Homes Soc. of America, Inc.,* 661 P.2d 632 (Alaska 1983); *Fridena v. Evans,* 127 Ariz. 516, 622 P.2d 463 (1981); *Elam v. College Park Hosp.,* 132 Cal.App.3d 332, 183 Cal.Rptr. 156 (1982); *Kitto v. Gilbert,* 39 Colo.App. 374, 570 P.2d 544 (1977); *Insinga v. LaBella,* 543 So.2d 209 (Fla.1989); *Mitchell County Hosp. Auth. v. Joiner,* 229 Ga. 140, 189 S.E.2d 412 (1972); *Darling v. Charleston Community Mem. Hosp.,* 33 Ill.2d 326, 211 N.E.2d 253 (1965); *Leanhart v. Humana Inc.,* 933 S.W.2d 820 (Ky.1996) (allowing patient access to documents placed in doctor's peer review file for a corporate negligence cause of action); *Ferguson v. Gonyaw,* 64 Mich.App. 685, 236 N.W.2d 543 (1975); *Gridley v. Johnson,* 476 S.W.2d 475

---

1. To the extent other decisions conflict with this opinion, they are disapproved. *See Lopez v. Central Plains Reg'l Hosp.,* 859 S.W.2d 600, 602 n. 2 (Tex.App.—Amarillo 1993, no writ); *Smith v. Baptist Mem'l Hosp. Sys.,* 720 S.W.2d 618 (Tex. App.—San Antonio 1986, writ ref'd n.r.e.); *Park North Gen. Hosp. v. Hickman,* 703 S.W.2d 262 (Tex.App.—San Antonio 1985, writ ref'd n.r.e.).

1. The Court relies on *Jeffcoat v. Phillips,* 534 S.W.2d 168 (Tex.Civ.App.—Houston [14th Dist.] 1976, writ ref'd n.r.e.) to argue that the courts of appeals are split on the issue of whether a common law cause of action exists. However, *Jeffcoat* was a summary judgment case in which the plaintiff failed to show that the hospital was required by law or obligated by its own rules to screen physicians to whom it granted privileges or review their work. *Jeffcoat* held only that a hospital was not liable in respondeat superior for granting privileges to a independent contractor doctor. *Jeffcoat* distinguished its facts from the case where a hospital had a duty based on its bylaws and regulations. *Id.* at 172–173.

(Mo.1972); *Hull v. North Valley Hosp.,* 159 Mont. 375, 498 P.2d 136 (1972); *Rule v. Lutheran Hosps. & Homes Soc.,* 835 F.2d 1250 (8th Cir.1987) (applying Nebraska law); *Oehler v. Humana Hosp.,* 105 Nev. 348, 775 P.2d 1271 (1989); *Corleto v. Shore Mem. Hosp.,* 138 N.J.Super. 302, 350 A.2d 534 (Law Div.1975); *Cooper v. Curry,* 92 N.M. 417, 589 P.2d 201 (App.), *cert. quashed,* 92 N.M. 353, 588 P.2d 554 (1978); *Raschel v. Rish,* 110 A.D.2d 1067, 488 N.Y.S.2d 923 (N.Y.App.Div. 1985); *Blanton v. Moses H. Cone Mem. Hosp.,* 319 N.C. 372, 354 S.E.2d 455 (1987); *Benedict v. St. Luke's Hosp.,* 365 N.W.2d 499 (N.D.1985); *Albain v. Flower Hosp.,* 50 Ohio St.3d 251, 553 N.E.2d 1038 (1990) (noting requirements for recovery in negligent credentialing cause of action), *overruled in part by Clark v. Southview Hosp. & Family Health Ctr.,* 68 Ohio St.3d 435, 628 N.E.2d 46 (1994); *Strubhart v. Perry Mem. Hosp.,* 903 P.2d 263 (Okla.1995); *Huffaker v. Bailey,* 273 Or. 273, 540 P.2d 1398 (1975); *Thompson v. Nason,* 527 Pa. 330, 591 A.2d 703 (1991); *Rodrigues v. Miriam Hosp.,* 623 A.2d 456 (R.I.1993);*Wheeler v. Central Vt. Med. Ctr.,* 155 Vt. 85, 582 A.2d 165 (1990); *Pedroza v. Bryant,* 101 Wash.2d 226, 677 P.2d 166 (1984); *Utter v. United Hosp. Ctr.,* 160 W.Va. 703, 236 S.E.2d 213 (1977); *Johnson v. Misericordia Community Hosp.,* 99 Wis.2d 708, 301 N.W.2d 156 (1981); *Sharsmith v. Hill,* 764 P.2d 667 (Wy.1988).[2] I would follow *Park North* and *Lopez* and recognize such a duty under the common law of Texas.

On the summary judgment record before us, the Agbors have raised a fact issue that the Hospital breached this duty. The evidence most favorable to them under the summary judgment proof is that the Hospital violated its own rules by failing to suspend Dr. Rothchild's privileges when she moved her permanent residence from Texas to Massachusetts in April 1990, by renewing her privileges in the summer of 1990 without carrying out any recredentialing activities, and by not suspending her privileges when she failed to carry insurance between 1988 and 1990.

## II

The Court does not reach the issue of whether such a cause of action exists. Instead, it holds that sections 5.06(*l*) and (m) of the TMPA, providing immunity for peer review activities against doctor and patient suits, bar any such claims that might exist. I disagree.

The provisions on which the Court relies state:

> A cause of action does not accrue against the members, agents, or employees of a medical peer review committee or against the health-care entity from any act, statement, determination or recommendation made, or act reported, without malice, in the course of peer review as defined by this Act.

Tex.Rev.Civ. Stat. article 4495b, § 5.06(*l*).

> A person, health-care entity, or medical peer review committee, that, without malice, participates in medical peer review activity or furnishes records, information, or assistance to a medical peer review committee or the board is immune from any civil liability arising from such an act.

Tex.Rev.Civ. Stat. article 4495b, § 5.06(m).

Read literally, these provisions do bar the Agbors' claims. To apply law properly, however, we must consider the entire act, its nature and object, and the consequences that would follow from a proposed construction. *Sharp v. House of Lloyd, Inc.,* 815 S.W.2d 245, 249 (Tex.1991); *Sayre v. Mullins,* 681 S.W.2d 25, 27 (Tex.1984). The Legislature has declared that when construing a statute courts may consider the object sought to be attained, the circumstances under which the

---

**2.** Of the other jurisdictions that have addressed corporate negligence, three have held that the charitable immunity doctrine bars a patient's recovery. *See Rhoda v. Aroostook Gen. Hosp.,* 226 A.2d 530 (Me.1967); *Hill v. Leigh Mem. Hosp.,* 204 Va. 501, 132 S.E.2d 411 (1963); *Grant v. Touro Infirmary,* 254 La. 204, 223 So.2d 148 (1969). One court held that a hospital was not liable for failing to withdraw a doctor's privileges in the absence of apparent authority. *See Strickland v. Madden,* 448 S.E.2d 581 (S.C.Ct.App. 1994). One court, as a matter of statutory interpretation has held that a hospital was not liable for an independent contractor physician's negligence. *See Lemuz v. Fieser,* 261 Kan. 936, 933 P.2d 134 (1997); *McVay v. Rich,* 255 Kan. 371, 874 P.2d 641 (1994).

statute was enacted, the legislative history, common law, and the consequences of a particular construction. TEX. GOV'T CODE § 311.023. As we recently noted:

> Here ... we are not presented with the statute as a whole, but a mere provision of the statute. Words in a vacuum mean nothing. Only in the context of the remainder of the statute can the true meaning of a single provision be made clear.

*Bridgestone/Firestone, Inc. v. Glyn–Jones,* 878 S.W.2d 132, 133 (Tex.1994). Or as Justice Hecht put it: "[I]n some circumstances, words, no matter how plain, will not be construed to cause a result the Legislature almost certainly could not have intended." *Bridgestone,* 878 S.W.2d at 135 (Hecht, J. concurring).

The meaning of a word in a statute depends on its context, and an essential part of the context of every statute is its purpose. HART & SACKS, THE LEGAL PROCESS: BASIC PROBLEMS IN THE MAKING AND APPLICATION OF LAW 1124 (William Eskridge & Philip Frickey eds., 5th ed.1994). Once a court has ascertained that purpose, the court should enforce it, even if that application seems inconsistent with the statute's strict letter. *See State v. Terrell,* 588 S.W.2d 784, 786 (Tex.1979); *see also* 2A SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 46.05 (5th ed.1992) ("[e]ach part or section should be construed in connection with every other part or section so as to produce a harmonious whole."). Thus, we have held that "when the intent and purpose of the Legislature is manifest from a consideration of a statute as a whole, words will be restricted or enlarged in order to give the statute the meaning which was intended by the lawmakers." *Bridgestone,* 878 S.W.2d at 134 (quoting *Lunsford v. City of Bryan,* 156 Tex. 520, 297 S.W.2d 115, 117 (1957)).

Applying these principles, I conclude that the Legislature did not intend to apply the heightened immunity provisions to patient suits against hospitals. The Legislature explained its purpose in section 1.02(1) of the TMPA:

> [T]he practice of medicine is a privilege and not a natural right of individuals and as a matter of policy it is considered necessary to protect the public interest through the specific formulation of this Act to regulate the granting of that privilege and its subsequent use and control.

Legislative regulation of credentialing is thus to protect patients and the public, not to insulate those who suffered bodily injury through a medical entity's negligence from legal redress.

Almost all of the TMPA manifests this purpose by addressing physician/hospital relationships. Subchapter B deals with the Board of Medical Examiners; Subchapter C deals with licensing; Subchapter D addresses disciplinary action. Most of Subchapter E as well focuses on peer review and physician and hospital rights. Sections 5.06(b)–(d), for example, set out the peer review committee's reporting requirements. Section 5.06(g) describes a doctor's right to privileged information if he files either an antitrust or § 1983 claim. Section 5.06(i) provides that if a peer review committee decides to take action against a doctor, he is entitled to a written copy of the committee's decision and recommendation. Section 5.06(q) provides a cause of action for health care entity employees if the hospital discharges or discriminates against them for complying with Section 5.06's reporting requirements. None of these sections curtails a patient's right to sue for negligent treatment or care by a medical facility.

Because there are no provisions in the statute that regulate physician/patient or hospital/patient relationships or that discuss patient care liability, a reading consistent with the purpose of the statute would limit the malice requirement in sections (*l*) and (m) to physicians' suits.

III

Moreover, nothing in the legislative history suggests that the Legislature intended to provide heightened immunity from patients' suits. The legislative debate focused on the same objectives envisioned in the federal statute—providing immunity for participants in peer review committees from retaliatory claims filed by disciplined doctors. During the discussion of the bill, Senator Chet

Brooks stated that the bill required reporting of improper actions of doctors and was accompanied by a liability shield for participants in peer review committees:

> We want the health care facilities that take adverse action against a physician's privileges to practice at that facility—to report that action to the Board of Medical Examiners so that the Board of Medical Examiners will have at least an alert there that they need to check into this and see what the basis for the removal of those privileges would be, and whether or not there ought to be some board follow-up on it. We also mandate peer review committees to report their findings that have to do with questionable practices to the board. And we also mandate physicians to report what they consider to be a threat to the patients and to the practice of medicine. Now to get this mandatory reporting we have also accompanied it in an even-handed way, with a liability shield—that as long as those reports are made in good faith and without malice or some illegal intent, that there would be no liability against them.

Debate on Tex. S.B. 171 on the Floor of the Senate, 70th Leg. (April 24, 1987) (tape available from Senate Staff Services Office).

Representative Mike McKinney explained that the House version of the bill strengthened the corresponding federal statute which itself was enacted to improve the quality of medical care by identifying incompetent physicians. The bill "provid[ed] some immunity for civil suits, for retaliatory suits, if you participate in peer review activities." Hearing on Tex. H.B. 283 before the House Public Health Comm., 70th Leg. (February 23, 1987) (tape available from the House Committee Coordinator's Office).

### IV.

The Court counters that its reading of the statute is not really unfair because such suits, if they are allowed in Texas, may prevail upon a showing of malice. I find it difficult to conceive that a hospital would credential its doctors with either the intent to harm patients or with such reckless disregard for their welfare as to establish malice.

Even if such a case were to exist, however, a plaintiff would not be able to prove it because another part of the TMPA prevents discovery of the peer review committee's records. Article 4495b, section 5.06(s) provides that in civil suits:

> (s)(1) Reports, information, or records received and maintained by the board [Texas State Board of Medical Examiners] pursuant to this section and Section 5.05 of this Act, including any material received or developed by the board during an investigation or hearing, are strictly confidential. . . .
>
> * * * * * *
>
> (3) In no event may records and reports disclosed pursuant to this article by the board to others, or reports and records received, maintained, or developed by the board, by a medical peer review committee, or by a member of such a committee, or by a health-care entity be available for discovery or court subpoena or introduced into evidence in a medical professional liability suit arising out of the provision of or failure to provide medical or health-care services, or in any other action for damages.

Thus, such a claim, no matter how meritorious, would be virtually impossible to prove. I would not give a statute so drastic a reading unless the words are clear and unmistakable. These are not.

This is one of those very rare instances where the literal words of a statute seem clearly beyond its actual intent. Nothing in the purpose, the statutory scheme, or the legislative history indicates that health care entities should be immune absent malice for any causes of action other than physicians' retaliatory claims. Therefore, I would not read the Act to do so. Instead, I would affirm the judgment of the Court of Appeals.

CORNYN, Justice, dissenting, joined by SPECTOR, Justice.

It is as clear as such things get that by enacting the Texas Medical Practice Act (TMPA) the Legislature did not intend to lower then prevailing standards of patient care by insulating hospitals from their own

negligence in credentialing physicians. But the Court's irregular construction of the TMPA does exactly that. The legislative history of the Act makes plain that the Legislature's sole concern was to elevate standards of patient care by encouraging physicians to deny hospital privileges to incompetent physicians. And while I join Chief Justice Phillips' dissenting opinion, I write separately to emphasize my concern with the way the Court summarily dispatches the Agbors' claim. In so doing, the Court violates a fundamental axiom of Texas law that

> if a statute ... deprives a person of a common law right, the statute will be strictly construed in the sense that it will not be extended beyond its plain meaning or applied to cases not clearly within its purview.

*Smith v. Sewell,* 858 S.W.2d 350, 354 (Tex. 1993); *Dutcher v. Owens,* 647 S.W.2d 948, 951 (Tex.1983); *Satterfield v. Satterfield,* 448 S.W.2d 456, 459 (Tex.1969).

In the 1960's, American jurisprudence began to acknowledge the hospital's emerging role as more than just a place where physicians treat patients. The modern hospital itself was becoming a direct and indirect provider of patient care. In the landmark case of *Darling v. Charleston Community Memorial Hospital,* 33 Ill.2d 326, 211 N.E.2d 253, 256–57 (1965), *cert. denied,* 383 U.S. 946, 86 S.Ct. 1204, 16 L.Ed.2d 209 (1966), the Supreme Court of Illinois held that a hospital owes a duty of ordinary care in the selection of its medical staff and in granting specialized privileges. Texas first embraced this duty in *Park North General Hospital v. Hickman,* 703 S.W.2d 262, 264–66 (Tex. App.—San Antonio 1985, writ ref'd n.r.e.) (citing *Darling,* 33 Ill.2d 326, 211 N.E.2d 253). Currently, as Chief Justice Phillips points out, twenty-seven jurisdictions have recognized this duty. Such a duty is but a particularized application of the more general duty articulated by RESTATEMENT (SECOND) OF TORTS § 323 (1965):

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking.

Thus a cause of action for negligent credentialing was available to patients at the time the Legislature amended section 5.06 of the TMPA in 1987 to incorporate the provisions of the Health Care Quality Improvement Act of 1986.[1] "It is now incontrovertible that hospitals owe a duty to their patients to properly investigate and evaluate physicians who apply for or who are permitted to provide professional medical services within the hospital." Torin A. Dorros & T. Howard Stone, *Implications of Negligent Selection and Retention of Physicians in the Age of ERISA,* 21 AM. J.L. & MED. 383, 408 (1995). This being the case, we are bound to apply the TMPA only to those cases that the Legislature clearly intended to cover. *See Smith v. Sewell,* 858 S.W.2d at 354.

Ignoring this rule of construction, the Court purports to rely on the "plain meaning" of the Act to justify its position that hospitals are not accountable for their negligence in selecting and retaining physicians. Used thus, as one commentator has expressed it, the plain-meaning rule at best states a tautology, and at worst severs language from its context. *See* David L. Shapiro, *Continuity and Change in Statutory Interpretation,* 67 NONPUBLIC. REV. 921, 932 (citing Reed Dickerson, THE INTERPRETATION AND APPLICATION OF STATUTES 229–233 (1975)). Such use of the plain-meaning rule also directly conflicts with the principle that a single provision of a statute must be read in the context of the remainder of the statute. *See Bridgestone/Firestone, Inc. v. Glyn-Jones,* 878 S.W.2d 132, 133 (Tex.1994).

---

1. Ironically, the Court purports to leave for another day the question of whether it recognizes a commonlaw cause of action for negligent credentialing. *See* 952 S.W.2d at 508. Under the Court's interpretation of the Act, however, that day will never come.

Looking at the language of the statute, we are to consider not just the disputed parts, but the statute as a whole. *See Taylor v. Firemen's & Policemen's Civil Serv. Comm'n,* 616 S.W.2d 187, 190 (Tex.1981); *State v. Terrell,* 588 S.W.2d 784, 786 (Tex. 1979).

As the Chief Justice notes, the Legislature's focus in the TMPA is on the physician-hospital relationship—not the patient-hospital relationship. The larger legislative landscape also bears this out.

Before Congress enacted the Health Care Quality Improvement Act of 1986 (HCQIA), incompetent physicians who had lost their privileges at one hospital were often able to move freely to another hospital. *See* Richard L. Griffith & Jordan M. Parker, *With Malice Toward None: The Metamorphosis of Statutory and Common Law Protections for Physicians and Hospitals in Negligent Credentialing Litigation,* 22 TEX. TECH. L. REV. 156, 180 n. 136 (1991) (citing H.R.REP. No. 99–903, at 2–3 (1986), *reprinted in* 1986 U.S.S.C.A.N. 6384, 6385). Fearing litigation, some hospitals would trade their silence about a physician's reasons for leaving for the physician's voluntary resignation, leaving the physician free to continue to practice medicine despite a record of incompetence. *Id.* at 180.

These fears were well-founded. In the period leading up to the passage of the HCQIA, physicians denied hospital privileges filed federal antitrust suits, exposing hospitals to the possibility of treble damages. *See, e.g., Patrick v. Burget,* 486 U.S. 94, 108 S.Ct. 1658, 100 L.Ed.2d 83 (1988); *Marrese v. Interqual, Inc.,* 748 F.2d 373 (7th Cir. 1984), *cert. denied,* 472 U.S. 1027, 105 S.Ct. 3501, 87 L.Ed.2d 632 (1985); *Posner v. Lankenau Hosp.,* 645 F.Supp. 1102 (E.D.Pa.1986); *Quinn v. Kent Gen. Hosp., Inc.,* 617 F.Supp. 1226 (D.Del.1985). They also filed civil rights claims. *See, e.g., Doe v. St. Joseph's Hosp.,* 788 F.2d 411 (7th Cir.1986); *Quinn,* 617 F.Supp. 1226. State courts saw their share of physician suits as well in the form of wrongful revocation of hospital privileges and defamation of character. *See, e.g., Dworkin v. St. Francis Hosp., Inc.,* 517 A.2d 302 (Del.Super.Ct.1986) (wrongful suspension

and termination); *Holly v. Auld,* 450 So.2d 217 (Fla.1984) (defamation); *Feldman v. Glucroft,* 488 So.2d 574 (Fla.Dist.Ct.App. 1986) (defamation), *cert. denied,* 503 U.S. 960, 112 S.Ct. 1560, 118 L.Ed.2d 208 (1992); *Atkins v. Walker,* 3 Ohio App.3d 427, 445 N.E.2d 1132 (1981) (defamation); *Guntheroth v. Rodaway,* 107 Wash.2d 170, 727 P.2d 982 (1986) (defamation).

In response, Congress passed the HCQIA. 42 U.S.C. §§ 11101 et seq. The purpose of the federal act was to " 'improve the quality of medical care by encouraging physicians to identify and discipline other physicians who are incompetent or who engage in unprofessional behavior.' " Griffith & Parker, 22 TEX. TECH. L.REV. at 180 (quoting H.R. REP. No. 99–903 at 2 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6384, 6384); *see also* 42 U.S.C. §§ 11101(1) & (3). To facilitate this result, Congress established the National Practitioner Data Bank, the national reporting system that tracks doctors' practice history and competency. To encourage physicians to report malpractice, the HCQIA confers both a privilege from discovery of the information provided in good faith in peer review activities and immunity from suits arising out of the peer review process. Griffith & Parker, 22 TEX. TECH. L.REV. at 181–82.

Texas doctors participating in peer review faced similar retaliatory suits. *See, e.g., Mayfield v. Gleichert,* 484 S.W.2d 619 (Tex. Civ.App.—Tyler 1972, no writ) (involving a libel suit brought by a doctor against the defendant-doctor for remarks made in a report the defendant-doctor prepared at the request of the hospital medical staff). Thus it is no surprise that Texas was quick to opt in to the HCQIA's coverage at an early effective date. *See* TEX.REV.CIV. STAT. art. 4495b § 5.06(a); *Memorial Hosp.—The Woodlands v. McCown,* 927 S.W.2d 1, 4 (Tex. 1996). By enacting the TMPA, the Legislature was attempting to improve the quality of health care by establishing a system that encourages effective peer review. *See* TEX. REV.CIV. STAT. art. 4495b § 1.02(1). To protect against physician retaliatory suits, the TMPA followed the HCQIA by establishing immunity from suit, absent malice, and a privilege from discovery of all communica-

tions made to a medical peer review committee.

Construing the TMPA to insulate health care providers from patient suits runs directly contrary to the Legislature's desire to improve the quality of health care. Patients do not have access to the same information that hospitals have through the National Practitioner Data Bank. Patients may only access the Data Bank after they have filed a medical malpractice suit and there is evidence that the hospital failed to query the Data Bank about a physician named in the suit. Elisabeth Ryzen, M.D., *The National Practitioner Data Bank: Problems and Proposed Reforms*, 13 J. LEGAL MED. 409, 419 (1992). Thus, for the most part, patients must rely on hospitals to verify the competency of physicians. To make hospitals virtually immune from patient suits does nothing to ensure that hospitals will diligently monitor physician competency. Instead, the Court's construction allows hospitals to negligently credential doctors and remain entirely immune from suit. This defeats the entire purpose of the Act.

For these reasons, I would hold that the malice standard set forth in article 4495b, sections 5.06(*l*) and (m) does not apply to patient claims for negligent credentialing. I would affirm the judgment of the court of appeals and remand this case for trial.