Reversed and Remanded and Majority and Concurring Opinions filed January
9, 2003









 

Reversed and Remanded and Majority and Concurring
Opinions filed January 9, 2003.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-00-01177-CV

____________

 

KPH CONSOLIDATION, INC. d/b/a

COLUMBIA KINGWOOD
MEDICAL CENTER, Appellant

 

V.

 

DOLORES ROMERO, INDIVIDUALLY AND ON
BEHALF OF INCAPACITATED PLAINTIFF RICARDO ROMERO, AND AS NEXT FRIEND OF RICARDO
ROMERO, JR., A MINOR, JENNIFER ROMERO

and JOANNA ROMERO, Appellees

 



 

On
Appeal from the 295th District Court

Harris County, Texas

Trial
Court Cause No. 98-48856

 



 

M A J O R I T Y   O P I
N I O N








Appellant, KPH Consolidation, Inc., d/b/a Columbia Kingwood
Medical Center (AHospital@), appeals a $23 million judgment against it based in part on
the jury=s finding that the Hospital acted
maliciously when it credentialed Dr. Merrimon Baker.  The suit was filed by a patient of Dr. Baker
who suffered severe neurological and physical impairments after an operation
Baker performed.  For two reasons, we
conclude the judgment must be reversed and rendered on the malice claim, and
reversed and remanded on the negligence claim. 
First, the record reveals no evidence showing that the Hospital acted
with malice Cspecifically with conscious
indifferenceCwhen it credentialed Dr. Baker and
therefore, the jury should not have been asked about actual malice.  Second, because the jury found that the
Hospital acted with malice, this finding forms at least part of the basis for
the jury=s award of actual damages, requiring
us to reverse all of the damages.

I.          PROCEDURAL
HISTORY.

Ricardo Romero and his family brought this suit to redress
severe neurological and physical injuries Mr. Romero suffered as a result of
surgery Baker performed.  The Romeros
sued Baker, a group of anesthesiologists, a certified nurse-anesthetist, and
the Hospital.  

Before trial, the Romeros settled with the doctors; at trial
the only defendants were the nurse-anesthetist and the Hospital.  

The Romeros= claims against the Hospital were based on two theories.  However, the only one at issue here is their
claim that the Hospital acted with malice by credentialing Baker to practice
medicine at the HospitalCeven
though it knew that he abused prescription drugs and was an incompetent
surgeon.[1]


The jury found that the Hospital acted with malice in
granting and maintaining Baker=s credentials, and that the Hospital, Baker, and one of the
anesthesiologists, Dr. Huie, were negligent. 
It assessed 40% of the fault to Baker, 20% to Dr. Huie, and 40% to the Hospital;
it awarded $40,600,000 in damages against all parties.  The jury=s award included a finding  that the Hospital should pay Mr. Romero and
Mrs. Romero a total of $12,000,000 in punitive damages.  








The trial court rendered judgment against the Hospital for
$11,440,000 in actual damages. 




II.        FACTUAL
BACKGROUND.

We will briefly review the surgery itself, then, because the
Hospital challenges only the malicious credentialing finding, the remainder of
the fact section will focus on two factual issues that control the outcome of
that claim:  the Hospital=s credentialing process and the
decision to credential Baker. 

A.        The
Surgery.

Ricardo Romero was referred to Baker for back surgery.  During surgery, Romero experienced
significant blood loss.  In fact, Romero
lost almost all the blood in his body. 
Shortly after a blood transfusion, he went into cardiac arrest and had
to be resuscitated.  He suffered severe
brain damage that left him totally disabled. 

B.        The Credentialing Process and Confidentiality.

 Barbara Pickett, the
Director of Quality and Resource Management at the Hospital, testified
regarding the credentialing process.  As
she explained, physicians applying for privileges are required to complete an
extensive questionnaire and provide peer recommendations.  The Hospital verifies the information the
applying doctor provides, checks the peer recommendations, reviews licenses in
other states, and contacts various agencies, including the Texas Board of
Medical Examiners, the Department of Public Safety, and the Drug Enforcement
Agency.  The information gathered is
reviewed by the chairman of the surgery department, who recommends to the
Medical Executive Committee whether to grant credentials.  The Medical Executive Committee then reviews
the applicant=s credentials and makes a
recommendation to the Hospital=s Board of Trustees; it makes the final decision. 

Both Pickett and Dr. Robert Rosen, a former member of the
Hospital=s surgery committee, testified that
the communications and deliberations of the Medical Executive Committee are
confidential.  They explained that the
purpose of confidentiality is to promote free discussion about the quality of
medical treatment by doctors at hospitals. 
Dr. Ronald Kerr, former Chief of Staff of the Hospital, testified that
the privilege is also beneficial for patients, because rumors or speculation
could have an adverse impact on the relationship between a doctor and a
patient.  

Here, the Hospital asserted the privilege for committee
communications and deliberations concerning Baker=s staff privileges.[2]  

C.        Credentialing Dr. Baker.

Because the Hospital chose to rely on the committee
confidentiality privilege, we know from other sources only three specific facts
concerning Baker=s application to be placed on staff and two facts regarding
his departure from the Hospital=s staff.  First, Baker
applied for privileges at the Hospital in February of 1993.  Second, he was given provisional status in
February of 1994.  Third, he was granted
active staff privileges at the Hospital in 1996.  

As for his departure, we know from deposition testimony of
Baker that he was suspended after the Romero surgery while the incident was
investigated.  We also know that he did
not reapply for staff privileges after they expired in the fall of 1998. 

III.       ISSUES RAISED ON APPEAL.








On appeal, the Hospital raises issues in six categories;
however, we address only one of them because it disposes of the entire
case.  In that issue, the Hospital claims
the evidence is legally and factually insufficient to support the malicious
credentialing claim.  Two components of
the issue are relevant to this appeal: 
first, the evidence was legally and factually insufficient to show that
the Hospital acted with malice when it granted Baker=s credentials and allowed him to
retain those credentials; and second, because the jury found malice, the whole
caseCincluding the actual damages based on
negligenceCmust be reversed because we cannot
determine if the jury based its damages award or percentage allocation of
liability on its malice finding.

IV.       MALICIOUS CREDENTIALING.

Before we can review the evidence presented at trial, the
issues the Hospital raises require us to review two areas of the law that
impact our decision:  (1) the legal
requirementsCboth at trial and on appealCof a malicious credentialing claim,
and (2) the confidentiality privilege afforded to the Hospital by statute.

A.        The Legal Requirements and Appellate Review of
a Malicious Credentialing Claim.








Malicious credentialing is a cause of action against a
hospital for acting with malice in credentialing a doctor or in peer
review.  In St. Luke=s Episcopal Hospital v. Agbor, 952 S.W.2d 503, 506 (Tex. 1997),
the Texas Supreme Court held that before a health care entity can be liable for
actions taken during peer reviewCincluding credentialingCmalice must be shown.[3]  The heart of a malicious credentialing claim
is proof of malice.  Here, the court gave
the jury the definition of malice contained in section 41.001(7)(B) of chapter
41 of the Civil Practice and Remedies Code. 
See Tex. Civ. Prac. &
Rem. Code Ann. ' 41.001(7)(B). 
That chapter applies to all causes of action in which a party seeks
exemplary or punitive damages.  See
Tex. Civ. Prac. & Rem. Code Ann.
' 41.002(a).  Accordingly, we first review the definition
of malice, then consider the quality of evidence necessary to prove malice, and
finally consider the standard of review.

1.         The
Definition of Malice.

Generally, the definition of malice under section
41.001(7)(B) consists of two componentsCone objective, one subjective.  North American Van Lines, Inc. v. Emmons,
50 S.W.3d 103, 127 (Tex. App.CBeaumont 2001, no pet) (citing Wal-Mart Stores, Inc. v.
Alexander, 868 S.W.2d 322, 325B26 (Tex. 1993)).  Objectively, the defendant=s conduct must involve an extreme
risk of harm, a significantly higher threshold than the objective reasonable
person test for negligence.  Id.  Subjectively, the defendant must have actual
awareness of the extreme risk created by the conduct.  Id. (citing Transp. Ins. Co. v.
Moriel, 879 S.W.2d 10, 22 (Tex. 1994)). 
Evidence of simple negligence is not enough to prove either the
objective or subjective components of malice. 
See Mobile Oil Corp. v. Ellender, 968 S.W.2d 917, 921 (Tex.
1998); Emmons, 50 S.W.3d at 127.

The exact statutory definition that applies here provides
that Amalice@ means the following:

an act or omission:

(i)        which, when viewed objectively from the standpoint of the
actor at the time of its occurrence involves an extreme degree of risk,
considering the probability and magnitude of the potential harm to others; and 

(ii)       of which the actor has actual, subjective awareness of the
risk involved, but nevertheless proceeds with conscious indifference to the
rights, safety, or welfare of others. 

Tex. Civ. Prac. & Rem. Code Ann. ' 41.001(7)(B). 

2.         The Quality
of Evidence Necessary to Prove Malice.








As for the quality of evidence necessary to prove malice,
four issues relevant here have been discussed in the case law:  (1) the objective requirement that an act
must involve an Aextreme degree of risk@ to qualify as malice; (2) the
subjective requirement that a defendant, with Aactual, subjective awareness@ of the risk, proceeds with Aconscious indifference@ to the rights, safety, or welfare of
others; (3) the need to present evidence that is clear and convincing; and (4)
the type of evidenceCdirect or circumstantialCthat may be used to prove the claim.[4]  We will briefly review each one. 

We turn first to the objective requirement that the act
involve an Aextreme degree of risk.@ 
This requirement, being a function of both the magnitude and the
probability of the potential injury, is not satisfied if the defendant=s conduct merely creates a remote
possibility of serious injury; rather, the defendant=s conduct must create the Alikelihood of serious injury@ to the plaintiff.  Universal Servs. Co., Inc. v. Ung, 904
S.W.2d 638, 641 (Tex. 1995).  The Supreme
Court explained this concept in Moriel: 


Determining whether an act or omission involves
extreme risk or peril requires an examination of the events and circumstances
from the viewpoint of the defendant at the time the events occurred, without
viewing the matter in hindsight.  In
every negligence or gross negligence case, some injury has allegedly
occurred.  However, the magnitude of the
injury may be entirely disproportionate to the riskiness of the behavior.Y If somebody has suffered grave injury, it may
nevertheless be the case that the behavior which caused it, viewed
prospectively and without the benefit of hindsight, created no great
danger.  In such a case, punitive damages
are not appropriate.   

Moriel, 879
S.W.2d at 23.   








We turn next to the subjective requirement of “actual,
subjective awareness” and “conscious indifference.”  See Tex.
Civ. Prac. & Rem. Code Ann. ' 41.001(7)(B)(ii).  Both elements must be met.  See General Motors Corp. v. Sanchez,
997 S.W.2d 584, 596 (Tex. 1999); Moriel, 879 S.W.2d at 22.  To uphold the jury=s finding, we must conclude that the
Hospital knew about the peril, and that its acts or omissions demonstrated it
did not care.  See Lee Lewis Constr.,
Inc. v. Harrison, 70 S.W.3d 778, 785 (Tex. 2001); Ellender, 968
S.W.2d at 921.  

Third, just as malice requires something more than the
typical negligence claim, the quality of evidence presented at trial also is
greater than in a regular negligence claim. 
The evidence necessary to prove the two prongs must be “clear and
convincing.”  Tex. Civ. Prac. & Rem. Code Ann. ' 41.003(a)(2).  Clear and convincing evidence is that measure
or degree of proof that will produce in the mind of the trier of fact a firm
belief or conviction as to the truth of the allegations sought to be
established.  Id. ' 41.001(2); Moriel, 879 S.W.2d
at 31.

The fourth issue also involves a quality issue concerning the
evidence: can a plaintiff rely on circumstantial evidence to prove malice?  Here, because the Hospital maintained its
privilege throughout the litigation, the Romeros were unable to obtain direct
evidence of committee documents or direct evidence of discussions regarding
Baker=s credentialing process.  Instead, they attempted to demonstrate
through circumstantial evidence what the Hospital knew or should have
discovered in the credentialing process. 








Both the objective and subjective prongs of malice can be
proven by circumstantial evidence.  See
Harrison, 70 S.W.3d at 785; Ellender, 968 S.W.2d at 921.  Circumstantial evidence may prove any
material fact, so long as it transcends mere suspicion.  Lozano v. Lozano, 52 S.W.3d 141, 149
(Tex. 2001) (Phillips, C.J., concurring and dissenting).  The material fact must be reasonably inferred
from the known circumstances.[5]  Id. 
However, it may not be proved by unreasonable inferences from other
facts and circumstances or by piling inference upon inference.  Schlumberger Well Surveying Corp. v. Nortex
Oil & Gas Corp., 435 S.W.2d 854, 858 (Tex. 1968).  Later, when we review the evidence, we will
consider the Hospital=s more specific claims that, although circumstantial evidence
may be used, the Romeros= cause of action fails because they did not have direct
evidence of (1) specific facts the credentialing committee knew or did not know
and (2) how the committee responded to the information. 

3.         The Standard
of Review.

For a finding of malice to be sustained on appeal, legally
sufficient evidence must show both that the act was likely to result in serious
harm and that the defendant was consciously indifferent to the risk of
harm.  See Moriel, 879 S.W.2d at
22; Emmons, 50 S.W.3d at 128. 
Evidence of malice is legally sufficient if, considered as a whole in
the light most favorable to the prevailing party, it rises to a level that
would enable reasonable and fair-minded people to differ in their
conclusions.  See Harrison, 70
S.W.3d at 785; Sanchez, 997 S.W.2d at 595; Moriel, 879 S.W.2d at
25.[6]  

In conducting a factual sufficiency review under the Aclear and convincing@ standard required to sustain a
finding of malice, we must determine whether the evidence in the record is such
that a factfinder could reasonably form a firm belief or conviction about the
truth of the allegations sought to be established.  See Tex.
Civ. Prac. & Rem. Code Ann. ' 41.003(a)(2); In re C. H.,
___ S.W.3d ___, ___ (Tex. 2002) (No. 00B552, July 3, 2002).  Evidence of ordinary negligence alone is not
enough to establish malice.  See Tex. Civ. Prac. & Rem. Code Ann. ' 41.003(b); Emmons, 50 S.W.3d
at 128.  




B.        The Statutory Cloak of Confidentiality.








Having reviewed the legal issues concerning a malicious
credentialing claim, and the definition contained in the Civil Practice and
Remedies Code, we now turn to two different code provisions that greatly impact
the success of a malicious credentialing claim. 
The statutes, which are contained in the Texas Occupations Code and the
Health and Safety Code, provide the Hospital and its doctors a  confidentiality privilege.  This privilege cloaks all proceedings and
records of a credentialing body in secrecy. 
The Texas Occupations Code provides for this privilege, stating that “each
proceeding or record of a medical peer review committee is confidential, and
any communication made to a medical peer review committee is privileged.”[7]  Tex.
Occ. Code Ann. ' 160.007.  The Health
and Safety Code also provides that the records and proceedings of a medical
committee are confidential and are not subject to court subpoena.  Tex.
Health & Safety Code Ann. ' 161.032.  These provisions are based on two
premises:  first, exacting, critical peer
review of doctors= competence and performance results in improved standards of
medical care;[8]
and second, an atmosphere of confidentiality is required for candid,
uninhibited communication of such critical analysis within the medical
profession.  See Memorial Hospital-The
Woodlands v. McCown, 927 S.W.2d 1, 3 (Tex. 1996).

V.        ANALYSIS OF THE EVIDENCE.

We now consider the evidence presented at trial.  As noted earlier, malice has two prongsCone objective, one subjectiveCboth of which must be met.  First, we will look for evidence to meet the
objective prong of malice and then for evidence to meet the subjective
prong.  

Under the objective prong, the Romeros rely on three specific
professional issues they claim show Baker posed an extreme risk of harm: drug
abuse, professional incompetence, and Dr. Kerr=s opinion of Baker.  As our discussion below will show, we
conclude that an extreme risk of harm is shown only for the drug abuse.








We will then turn to the subjective prong.  However, having found no evidence to show an
extreme risk of harm based on professional incompetence or Dr. Kerr=s opinion of Baker, we will review
the only issue surviving the objective prong: 
Baker=s drug abuse.  We will then look at that issue to decide if
the Hospital had subjective awareness of it. 
Concluding that the Hospital did have subjective awareness of the drug
abuse, we will then turn to the final issue: 
whether the Hospital was consciously indifferent to the risk of harm
Baker=s drug abuse posed. 

A.        The
Objective component:  Extreme Risk of
Harm.

To prove the objective component of malice, the Romeros were
required to show that, considering the probability and magnitude of the
potential harm to others, the Hospital=s conduct involved an extreme risk of
harm.  See Tex. Civ. Prac. & Rem. Code Ann. ' 41.001(7)(B)(i); Sanchez, 997
S.W.2d at 595; Emmons, 50 S.W.3d at 127. 

We first examine whether the Hospital=s conduct in extending and
maintaining Dr. Baker=s staff privileges at the Hospital posed an extreme risk of
serious injury to patients.  The Hospital
makes a five-part challenge to the objective component of malice, claiming that
there is no evidence of the following: 
(1) whether an official complaint about Baker was lodged, (2) what
conduct or deficiency that complaint raised, (3) what objective facts were
presented to the committee or the board, (4) Baker=s ability to perform surgery when the
credentialing decisions were made, and (5) what action the Hospital took in
response to what it learned.  As noted
earlier, there is no specific evidence of these items because the Hospital
chose to stand on its privilege. 
However, we do not agree that all of these questions must be answered
affirmatively before the Romeros can prove the objective prong.  As we discuss below, enough circumstantial
evidence exists to show that Baker had a drug abuse problem and that a doctor
abusing drugs poses an extreme risk to patients. 








1.         Drug Abuse.

a.         Legal
Sufficiency.

The Romero=s credentialing expert, Dr. Eichhorn, testified that when the
chief of staff knows that a doctor poses a risk to patient safety, and has been
told that the doctor allegedly abuses drugs, the chief of staff and hospital
put the hospital=s patients at extreme risk if the doctor is put on the
staff.  Even the Hospital=s expert conceded that a doctor who
operates while on drugs can pose a serious risk to patients.  

The Hospital=s own application process and Code of Conduct further
demonstrate the importance of a drug-free environment.  The Hospital requires every physician
applying for privileges to disclose whether he or she is Ausing illegal drugs or illegally
abusing legal drugs,@ and investigates the applicant=s references to confirm the
truthfulness of the answer.  The Hospital=s Code of Conduct warns that those
who report to work under the influence of any illegal drug or alcohol in their
system face immediate termination. 

A Hospital employee in charge of working with the
credentialing committee and with quality control for the Hospital testified
that if the chief of staff hears that a doctor being considered for privileges
abuses drugs, he has an obligation to inform the credentialing committee.  Furthermore, an expert for the Hospital
agreed that, with this type of information available to it, a credentialing
committee would investigate.  

Viewing the evidence in the light most favorable to the
verdict, the evidence showed that the Hospital knew that a doctor who abuses
drugs poses an extreme risk to patients. 

b.         Factual
Sufficiency.








The Hospital does not dispute that Baker was addicted to
prescription drugs.  There was evidence
that Baker took Vicodin, a prescription narcotic, “by the handfuls.”  The Hospital=s credentialing expert, Dr. Binder,
confirmed that even when taken at recommended dosages, Vicodin can cause
adverse reactions of the central nervous system, including drowsiness, mood
changes, and impairment of mental and physical performance.  Although Dr. Binder acknowledged that Baker
took prescription narcotics by the handfuls, he attempted to downplay the
significance of the possible adverse reactions to the drugs as a “warning issue”
that applies to almost all drugs.  He
also opined that drug abuse does not necessarily imply impairment, noting that “[a]lcoholics
do their job every day.”  However, Dr.
Binder conceded that it was never acceptable for a physician impaired by drugs
to operate on a patient.

Baker=s former wife testified that Baker exhibited mood swings and
erratic behavior when he abused drugs. 
She testified that, a few days before Romero=s surgery, Baker assaulted her and
threatened to commit suicide.  She stated
that at the time of the assault, Baker exhibited the same behavior she observed
on other occasions when he abused drugs, only more extreme than she had
previously seen.  Although there is no
evidence that the Hospital was aware of this incident, it provided the jury
with a graphic illustration of the type of adverse reaction that can occur when
a physician abuses drugs as Baker did, and the jury was free to consider it
when weighing Dr. Binder=s testimony.

We find that the Romeros presented factually sufficient
evidence from which a jury could find that, from the viewpoint of the Hospital,
its conduct in granting or maintaining surgical privileges for a doctor who
abuses drugs involved an extreme degree of risk.

2.         Professional
Incompetence.

In addition to the evidence relating to drug addiction, the
Romeros urged that Baker posed an extreme risk as a result of his professional
incompetence.  In support of this
argument, the Romeros relied on malpractice lawsuits against Baker, including
two wrong-limb surgeries, and Dr. Kerr=s opinion of Baker.  We will review the malpractice suits first
and then consider Dr. Kerr=s opinion.








a.         Malpractice
Suits and Wrong-Limb Surgeries.

(1)       Legal
sufficiency.

The Romeros do not claim that only one or two malpractice
suits are sufficient to prove that a doctor poses an extreme risk to
patients.  They allege here that the
sheer number of claims, including the type of claims, prove that Baker posed an
extreme risk to patients.  Below we
review the evidence they relied upon.

In an attempt to show that Baker posed an extreme risk based
on malpractice suits and Abotched@ surgeries, the Romeros introduced evidence that, in the
course of the credentialing process, the Hospital would have learned of a
number of malpractice complaints that had been filed against Baker.  When Baker applied for privileges with the
Hospital, he was required to disclose any malpractice complaints against
him.  The Romeros submitted into evidence
a number of malpractice lawsuits that had been filed against Baker.  According to the Hospital=s own credentialing expert, the peer
review committee would have researched Baker=s history regarding malpractice
actions; this would have included reviewing the National Practitioner Data
Bank, a federal data bank that records malpractice settlements by doctors.[9]  The Romeros argued that the database would
have contained the malpractice actions against Baker that resulted in
settlements, including one lawsuit in which Baker operated on the wrong leg of
a patient and another in which he left a sponge in a patient.  The last of these lawsuits was in 1993.








In mid-May of 1998, two months before Romero=s surgery, nearby Cleveland Regional
Medical Center suspended Baker=s operating privileges. 
Baker admitted that one of the reasons for the suspension was that he
operated on the wrong leg of a patient, although Cleveland Regional did not
give this as a reason for suspending Baker.[10]  Dr. Rosen, who was Chief of Staff at
Cleveland Regional and on the Hospital=s surgery committee, admitted that he
knew about this suspension.  However, he
also testified that when doctors from Cleveland Regional were reviewed at the
Hospital, he did not participate in those discussions because of peer review
confidentiality.  Dr. Rosen further
testified that Baker obtained a restraining order to prevent anyone at
Cleveland Regional from discussing or mentioning Baker=s suspension.  That order did not expire until July 16,
1998, one day after Romero=s surgery. 

Baker testified that he was suspended from the Hospital
pending an investigation after the Romero surgery, but there was also evidence
that he performed at least two surgeries there in September.  He did not reapply for privileges at the
Hospital.

The Romeros argue that Baker=s malpractice claims alone would
support the jury=s finding of extreme riskCindependent of his drug use.  In support of this argument, they point us to
the testimony of their expert, Dr. Eichhorn, who testified that Baker posed an
extreme risk to patients.  However, when
stating that Baker posed an extreme risk to patients, Dr. Eichhorn did not rely
solely on the malpractice evidence. 
Rather, his opinion was based upon all of the Romeros= evidence, including evidence of the
alleged drug abuse and the second wrong-limb surgery (the Chavez surgery) at
Cleveland Regional in 1998.  








The Hospital=s expert agreed that repeated instances of operating on the
wrong limb was not an acceptable outcome. 
However, for two reasons, we cannot conclude that the Hospital knew of
the Chavez surgery before the Romero surgery. 
First, the record contains no evidence that the Hospital knew of the
Chavez surgery, or of Baker=s suspension, until after the Romero surgery.  The only time the Hospital could have found
out about them was during a period between Baker=s suspension at Cleveland Regional
and the date the restraining order went into effect.  But, other than Dr. Rosen=s affirmative statement that he did
not reveal any information to the Hospital, this record contains absolutely no
evidence to show that the Hospital heard about the suspension or that it was
likely that the Hospital would hear about it. 
To say that the Hospital did hear about it would require an assumption;
to say that it did not hear about it would also require an assumption.  And, since there is no evidence to show that
either assumption would be reasonable, we are not authorized to make either
assumption.  Second, the lawsuit
resulting from the Chavez surgery would not have appeared in the National
Practitioner Data Bank until it settled. 
The lawsuit was not even filed until after the Romero surgery.  

The Romeros presented no evidence or expert opinion that, in
the absence of  knowledge of the Chavez
surgery, or in the absence of drug abuse, Baker would have posed an extreme
degree of risk to patients as a result of the prior malpractice actions.

In short, the malpractice suits filed between 1988 and 1993
are no evidence that Baker posed an extreme risk to patients due to
professional incompetence.  Consequently,
the evidence is legally insufficient to demonstrate that Baker=s malpractice suits revealed a
potential for extreme degree of risk.  See
Agbor, 952 S.W.2d at 509 (upholding summary judgment against plaintiffs who
alleged hospital was grossly negligent in renewing staff privileges of doctor
who had been the subject of many medical malpractice cases, was not a Texas
resident, and was not properly insured for medical malpractice).  Having found legally insufficient evidence on
this item, we need not perform a factual sufficiency review.

 

b.         Dr. Kerr=s Opinion of Baker.

(1)       Legal
sufficiency.

At first glance, perhaps the most compelling evidence
regarding professional incompetence was testimony by Dr. Kerr, the Hospital=s Chief of Staff in 1996.  He admitted that he believed Baker posed a
risk to the safety of patients, and that he had consistently held this opinion
since 1990. 

For Dr. Kerr=s opinion to meet the statutory requirement, his
testimony must show that Baker=s level of competency was so bad that it involved an extreme
degree of risk.  See Tex. Civ. Prac. & Rem. Code Ann. ' 41.001(7)(B)(i).  This threshold is significantly higher  than the objective “reasonable person” test
for negligence.  See Moriel, 879
S.W.2d at 22.  “Extreme risk” is a
function of magnitude of injury and probability of injury.  Id.  The “extreme risk” (objective) prong of
malice is not satisfied by a remote possibility of injury or even a high
probability of minor harm; it is satisfied only by “the likelihood of serious
injury” to the plaintiff.  See id.  We agree that Dr. Kerr=s testimony was sufficient to show
that Baker posed a risk to patients; the question is whether the testimony
showed by clear and convincing evidence that Baker posed an extreme risk
to patients.  

Unquestionably, Dr. Kerr intensely disliked Baker and did not
trust him.  This was in part because of a
business dispute between them in 1990 and in part because of (1) knowledge
Dr. Kerr gained as a result of an investigation he did into Baker=s background, and (2) from his own
experiences with Baker.  As for the
business dispute, Dr. Kerr testified that Baker was sharing office space with him,
had agreed to split the costs of equipment and rent, and, only a month after
the arrangement began, stopped paying his share. 








But the distrust also seemed to stem in part from Dr. Kerr=s own encounters with Baker and from
information he received from a medical group in South Carolina that fired
Baker.  A lawyer for the group told Dr.
Kerr that Baker had forged signatures on his application for a license to practice
in Mississippi; because of this, the license was initially denied, but later
granted.[11]  He also told Dr. Kerr that the South Carolina
group fired Baker because he had “patient care issues” and was not “working in
a manner that they felt was good.” 
According to the lawyer, the group had determined a course of treatment
for a long-time patient of the group; Baker intervened and undertook a totally
different, more aggressive approach.  The
approach, which involved surgery, resulted in problems for the patient.  Baker apparently tried to “remove the patient
from the scene” by moving the patient to a smaller hospital.  

Dr. Kerr himself experienced attempts by Baker to take over
his patients who came to the emergency room. 
Apparently, the patients were told that Dr. Kerr was out of town and
that Baker would be seeing them.  Dr.
Kerr said that he had made no such arrangement with Baker.

Based on these things, Dr. Kerr formed an opinion that Baker “certainly
wasn=t qualified to be practicing with
[him],” and that he did not want Baker to see his patients or have anything to
do with his patients.  He agreed that
these opinions were “at least in part, from the concern of safety.”  We do not think that this evidence is legally
sufficient to demonstrate that Baker posed an extreme degree of risk.

(2)       Factual
sufficiency.

Even if we were wrong in our conclusion that the evidence was
legally insufficient, a factual sufficiency review clearly would reveal
insufficient evidence.  Under a factual
sufficiency review, we would look at the following additional evidence.








Apparently, Dr. Kerr thought Baker was a poor doctor and he
did not want Baker to take care of his patients.  He also appears not to have trusted Baker on
a personal or professional level. 
However, he never reported Baker to the State Board of Medical Examiners
for any misconduct.  (Baker was not
referred to the Board until 1996, when his former partner turned him in for
suspected drug abuse.)  He never once
mentioned the word “injury” in his testimony. 
He also admitted that his opinion of Baker posing a risk to patients was
not based on specific instances of patient treatment at Kingwood; it was based
on the information he obtained in his investigation of Baker in 1990.  When asked what he had directly observed
about Baker=s practice, he referred only to the
problem he had with Baker taking some of his emergency-room patients without
his permission.  He did not refer to any
care issues at the Hospital. 

Viewing this evidence in its entirety, we do not believe that
a reasonable jury could form a firm belief or conviction that Baker posed an
extreme risk of serious injury to patients because of professional
incompetence.  See In re C. H.,
___ S.W.3d at ___.

Summary of Objective Prong
Discussion

In summary, the Romeros satisfied the objective component of
malice, but only with regard to Baker=s drug abuse.

B.        The Subjective
Component:  Actual Subjective Awareness
and Conscious Indifference.

 

We next examine the second component of malice_the subjective component.  It has two elements: (1) whether the Hospital
had actual, subjective awareness that Baker posed an extreme risk to patients,
and (2) with conscious indifference to the rights, safety, or welfare of its
patients, still granted him credentials to practice at the Hospital.  See Tex.
Civ. Prac. & Rem. Code Ann. ' 41.001(7)(B)(ii); Sanchez,
997 S.W.2d at 596; Moriel, 879 S.W.2d at 22.  As we explain below, we find legally and
factually sufficient evidence to support a finding that the Hospital was
subjectively aware of the extreme risk. 
However, because we do not know what actions the Hospital took in
response to its knowledge, the record fails to support a finding that the
Hospital was consciously indifferent.








1.         Subjective
Awareness.

a.         The
Parties= Arguments.

The Hospital argues that the jury was required to find that
the subjective awareness and the decision to credential had to coexist in the
collective minds of all voting members of the applicable committee.  It argues that no reasonable jury could make this
finding in the absence of the following evidence:  (1) whether a complaint was ever made about
Dr. Baker; (2) what evidence was reviewed by the Hospital; (3) the quantity and
credibility of that evidence; (4) how each voting member viewed that evidence;
(5) the content and extent of discussion about the evidence; (6) the nature and
believability of any defenses or explanations offered by Baker; and (7) the
subjective basis for each doctor=s vote.  Clearly, most of these issues can be proved
only by direct evidence, an argument we reject. 
As we have stated, the knowledge, actions, or proceedings of the
credentialing committee may be proved by circumstantial evidence.  The amount of detail the Hospital claims we
need is not required to prove subjective awareness.

To prove subjective awareness, the Romeros point to the same
evidence they relied on for the objective component:  the drug abuse and professional
incompetence.  Because we have already
held that the Romeros did not meet the first component of malice, as to whether
Baker posed an extreme risk to patients because of professional incompetence,
we need not address whether they met the second component.  Instead, we will consider what proof showed
that the Hospital was subjectively aware of Baker=s drug abuse.

b.         Subjective
Awareness of Drug Abuse.

The Romeros argue that the Hospital was subjectively aware of
the extreme risk Baker posed to patients as a result of his drug abuse.  They claim the Hospital gained this knowledge
from the credentialing process, and that this knowledge would have included Dr.
Kerr=s knowledge of suspected drug abuse. 








(1)       Legal
sufficiency of the evidence.  

We agree that the evidence listed below shows that the
Hospital had actual, subjective awareness that Baker was abusing drugs.  This knowledge stems from Dr. Kerr, not
because Dr. Kerr was a vice-principal of the HospitalCa question we do not reachCbut, because, being chief of staff,
he would have told the Hospital about the alleged abuse.

Barbara Pickett, the Director of Quality and Resource
Management at the Hospital, testified that if the chief of staff (Dr. Kerr)
knew that a particular physician posed a risk to patients, or had heard allegations
of drug abuse by a physician=s partner, the chief of staff had an obligation to tell the
credentialing committee.  Additionally,
Dr. Binder, the Hospital=s credentialing expert, testified that if there are
allegations of drug abuse against a physician, a hospital must investigate the
allegations.  Dr. Binder assumed Dr. Kerr
performed his duty  to report and
investigate allegations of drug abuse against Baker, and there is no evidence
Dr. Kerr did not do so.  Dr. Binder
testified that an investigation would include speaking to Dr. Parkinson, the
physician who made the allegation, and speaking to Baker=s office manager, Janet Pickett, who
confronted Baker about his drug use and accompanied him to drug
counseling.  Dr. Binder also testified
that it was reasonable to assume that, if the Hospital followed its procedures,
it would have obtained Baker=s counseling records and confirmed his drug abuse.  There was no evidence that the Hospital
failed to follow its procedures.  

Moreover, Baker=s former wife testified, without
objection, that the Hospital was aware of Baker=s drug abuse.  She also testified that the Hospital
postponed its 1996 credentialing decision until the Board of Medical Examiners
completed its review of the allegations of drug use and excessive lawsuits
against Baker.  Viewed in the light most
favorable to the Romeros, we find legally sufficient evidence exists that the
Hospital was subjectively aware of Baker=s drug abuse.








(2)       Factual
sufficiency of the evidence.

The Hospital argues that it is undisputed that when the 1996
credentialing occurred, two years before Romero=s surgery, the State Board of Medical
Examiners had considered allegations of drug abuse and numerous malpractice
claims against Baker, but closed its investigation with no recommended
action.  Consequently, it claims this
evidence, coupled with the lack of direct evidence of the credentialing
committee=s knowledge, actions, and proceedings
relating to Baker foreclose the Romeros= claim.  However, we have already rejected the
Hospital=s contention that such direct
evidence is required.  And, the evidence
that the Board of Medical Examiners closed its investigation into Dr. Baker=s alleged drug abuse and excessive
malpractice lawsuits without further action is not dispositive.  The Board=s decision not to act does not excuse
the Hospital from carrying out the review mandated by its own procedures.  Indeed, Dr. Binder, the Hospital=s credentialing expert, testified
that the Hospital=s obligation to investigate Baker=s background was independent from the
Medical Board=s. 
Therefore, based on the evidence presented, we find that a reasonable
jury could form a firm belief or conviction that the Hospital had actual,
subjective awareness that Baker posed an extreme risk to patients. 

In summary, the Romeros demonstrated by legally and factually
sufficient evidence that the Hospital had actual, subjective awareness that
Baker=s drug abuse posed an extreme risk to
patients. 

c.         Conscious
Indifference.








We now turn to the final hurdle for the Romeros in proving
the subjective prong:  conscious
indifference.  The Romeros contend that
the Hospital acted with conscious indifference to the rights of its patients by
failing to deny or revoke Baker=s privileges despite its actual, subjective awareness of the
risk he posed because of his drug abuse. 
They claim three items of evidence show conscious indifference: first,
the Hospital=s decision to credential Baker and
not suspend him before the Romero surgery even though it knew about the drug
abuse; second, the Hospital=s decision to allow Baker to operate after the surgery; and
third, Dr. Eichhorn=s testimony.

(1)       Drug abuse.

As we have discussed, the Romeros showed that the Hospital
had actual, subjective awareness that Baker=s drug abuse posed an extreme risk to
patients.  The crux of their argument on
conscious indifference appears to be that the Hospital was obligated to (1)
automatically deny Baker=s active staff credentials in 1996 or (2) suspend or
terminate those credentials at some point thereafter as soon as it became aware
of Baker=s drug use and the malpractice
actions against him.  However, the
evidence in the record_including that of the Romero=s credentialing expert, Dr. Eichhorn_does not support this theory; it contradicts it.

When asked what the Hospital should have done if it suspects
a physician of drug abuse, Dr. Eichhorn testified that a hospital committee
should take several steps.  First, the
physician should be confronted under controlled conditions and subjected to
drug testing.  Next, the hospital should
conduct an investigation of other institutions at which the physician has
privileges to request their peer review information.  And, on cross-examination, Dr. Eichhorn agreed
that a number of other options exist when a hospital learns of alleged
substance abuse; these options include monitoring, education, restrictions,
counseling, and termination.  However,
Dr. Eichhorn did not testify, nor did he suggest, that when the   Hospital discovered Baker=s substance abuse, it should have
refused Baker active staff privileges in 1996 or withdrawn them at some point
later.[12]
 

Because the Hospital invoked its confidentiality privilege,
we do not know what the Hospital did in response to the information it
had.  We do not know if it took any steps
such as requiring Baker to submit urine samples, or monitoring
Baker, or if it did nothing.  But one
thing we do know:  we cannot infer
anything from this lack of information.  See
Hammerly Oaks, Inc. v. Edwards, 958 S.W.2d 387, 392 (Tex. 1997) (holding
meager circumstantial evidence, which could give rise to any number of
inferences, is legal equivalent of no evidence).

In short, viewing the evidence in a light most favorable to
the verdict, we find no evidence that the Hospital acted with conscious
indifference in not suspending Baker at some point before the Romero surgery. 

(2)       Allowing Baker
to operate after the Romero surgery.

We next address the evidence that Baker was permitted to
operate on other patients after he Abotched@ the Romero surgery.  Baker=s privileges at the Hospital were up
for renewal in August of 1998, but he, along with the other physicians at the
Hospital, was given a temporary extension due to an internal delay in the
reappointment process.  Thereafter, Baker
operated at least twice in September of 1998. 
He did not reapply for privileges. 
However, the record also contains evidence that Baker was suspended from
the Hospital pending an investigation because of the Romero surgery.  Baker himself stated this in a videotaped
deposition shown at trial.








This evidence, that the Hospital allowed Baker to operate,
does not constitute clear and convincing evidence that the Hospital acted with
conscious indifference in granting Baker privileges in 1996 or in failing to
withdraw or suspend them at some point before the Romero surgery.

(3)       Dr. Eichhorn=s testimony.

Finally, the Romeros contend that the testimony of their
credentialing expert, Dr. Eichhorn, is some evidence to support conscious
indifference.  They point to two points
of his testimony:  Dr. Eichhorn=s opinion that the Hospital had
actual, subjective awareness of the extreme risk posed by Dr. Baker,[13]
and his opinion that Baker=s privilege should have been suspended before the Romero
surgery.  Unfortunately for the Romeros,
neither opinion supports a finding of conscious indifference.  First, Dr. Eichhorn testified only that the
Hospital had subjective awareness of the risk; we have already agreed that the
evidence supports this conclusion. 
However, as we have explained, subjective awareness of a risk_without more_is not enough.  And, Eichhorn was not permitted to give an
opinion whether the Hospital acted with conscious indifference.[14]  Second, Eichhorn=s testimony that the Hospital should
have suspended Baker before the Romero surgery was based not only on the drug
abuse, but also on the Chavez surgery at Cleveland.  No evidence shows that the Hospital knew
about the Chavez surgery until after Romero=s surgery.  Therefore, Dr. Eichhorn=s testimony does not support a
conclusion that the Hospital acted with conscious indifference.

         Summary of Discussion of Malicious
Credentialing Claim








In sum, the Romeros met the objective prong of the malicious
credentialing claim as to Baker=s drug abuse, and also showed that the Hospital was
subjectively aware of the extreme risk Baker=s drug abuse posed to patients.  However, the Romeros failed to demonstrate
that the Hospital acted with conscious indifference.  We therefore sustain the Hospital=s complaint that legally insufficient
evidence existed to support the malicious credentialing claim.

The Romeros argue that if malice was not proved here, it can
never be proved.  They may very well have
a point.  Texas Supreme Court Chief
Justice Tom Phillips commented in Agbor that under our current law, the
heightened immunity provided by the Texas Medical Practice Act makes proving a
malicious credentialing claim “virtually impossible,” “no matter how
meritorious” the claim.  Agbor,
952 S.W.2d at 512 (Phillips, C.J., dissenting).

I find it difficult to conceive that a hospital would
credential its doctors with either the intent to harm patients or with such
reckless disregard for their welfare as to establish malice.  Even if such a case were to exist, however, a
plaintiff would not be able to prove it because Y the Y [Act] prevents discovery of the peer review committee=s records. 

Id.

This case certainly does nothing to contradict Chief Justice
Phillips=s point, because, as discussed, many
troubling facts were known about Baker. 
Yet, without proof of what actions the Hospital did or did not take in
response to Baker=s problems, the Romeros could not prove conscious
indifference.

V.        ALLEGED CHARGE
ERROR.

Having found that there was legally insufficient evidence to
support the submission of the malicious credentialing claim, we turn to the
Hospital=s complaints regarding the
charge.  We will first consider the
standard of review, then look at the questions asked of the jury, review the
parties= arguments on this issueCincluding a waiver argument the
Romeros raiseCand then finally apply the standard
of review to the charge itself.

 

A.        The Standard of Review.

The standard of review controls our answer to these
arguments.  For alleged charge error to
be reversible error, the trial court must have abused its discretion.  Texas Dep’t of Human Servs. v. E. B., 802
S.W.2d 647, 649 (Tex. 1990).  The court
abuses its discretion in connection with the chargeCand commits reversible errorCif the error probably caused the
rendition of an improper judgment.[15]  Tex.
R. App. P. 44.1(a)(1).  In
determining whether error is reversible, we must consider the record as a
whole, including the parties= pleadings, the evidence presented at trial, and the charge
in its entirety.  Island Recreational
Dev. Corp. v. Republic of Texas Sav. Ass=n, 710 S.W.2d 551, 555 (Tex. 1986).  

B.        The Parties’ Arguments.

 The Hospital contends
that the error in submitting the malicious credentialing claim tainted the
entire charge.  It notes that the court
submitted a single damages question and a single question on the apportionment
of liability (predicated on a finding of either ordinary negligence and/or the
improperly-submitted malicious credentialing claim).  It claims this error cannot be isolated and
rendered harmless because we cannot tell if the jury apportioned fault and awarded
damages on the basis of its malice finding. 
The Hospital urges us to remand for a new trial under the Texas Supreme
Court=s pronouncements in Crown Life
Ins. Co. v. Casteel, 22 S.W.3d 378, 390 (Tex. 2000); see also Harris
County, Texas v. Smith, No. 01-0531, ___ S.W.3d ___ (Tex. December 19,
2002).  In Casteel, the Court held
that when a trial court submits a single broad-form liability question
incorporating multiple theories of liabilityCsome of which are invalidCthe court commits reversible error
and a new trial is required if the appellate court cannot determine if the jury
based its verdict on an invalid theory.  Casteel, 22 S.W.3d at 390.








The Romeros respond with three arguments.  First, they claim the Hospital waived any
error on this issue because it objected to both a single submission of the
apportionment question and the submission of two apportionment questions, and
did not suggest an alternative.  Second,
the Romeros argue that Casteel applies only when invalid claims are
mixed with valid claims.  According to
the Romeros, adopting the Hospital=s position would extend Casteel
to sufficiency complaints, making broad-form submission obsolete, and resulting
in needless relitigation of valid claims. 
Third, they argue that the verdict and, at the very least, the actual
damages, should be affirmed because the jury found the Hospital liable for
ordinary negligence, and that finding has not been challenged.  We will take the time here to briefly address
the waiver argument.  The remainder of
the argumentsCfor both partiesCwe will address under section D, when
we apply the standard of review to the facts of this case.

Regarding the Romeros= waiver argument, the record is clear
that the Hospital made the trial court aware of its complaint.  During the charge conference, the Hospital
specifically referenced Casteel in its objection to a single
apportionment question, and further objected to the submission of two
apportionment questions on the grounds that it would be an improper comment on
the weight of the evidence.  The trial
court understood the objections, and made her ruling to submit a single
apportionment question.  As the Texas
Supreme Court has repeatedly admonished, “[t]here should be but one test for
determining if a party has preserved error in the jury charge, and that is
whether the party made the trial court aware of the complaint, timely and
plainly, and obtained a ruling.”  State
Dep=t of Highways & Pub. Transp. v.
Payne, 838 S.W.2d
235, 241 (Tex. 1992).  Therefore, we hold
that the Hospital did not waive its objection.

C.        The Jury Issues.








The issues submitted to the jury are central to our
review.  The first four issues exemplify
the problems the Hospital raises. 
Questions 1 and 2 are listed because they show what the jury was asked
regarding negligence and malicious credentialing.  Questions 3 and 4 are set out to show both
the questions asked of the jury and the prefatory language used to instruct the
jury on whether to answer them.  

Question No. 1

Did the negligence, if any, of those named below
proximately cause the occurrence or injury in question?

In answering this question, do not consider the
conduct of Columbia Kingwood in the granting or the retention of Dr. Merrimon
Baker=s active surgical credentials.  Consider only the conduct of Suwanna Rubio,
RN, other hospital nurses and the hospital blood laboratory personnel.

Answer “Yes” or ANo@ for each of the following:

a.         Columbia Kingwood   “yes@  

b.         Linda Fincher CRNA              “no@  

c.         Dr. Merrimon Baker              
“yes@  

d.         Dr. William Huie                    “yes@  

 

If you have answered Ayes@ as to Dr. Merrimon Baker in Question No. 1, then
answer the following question. 
Otherwise, do not answer the following question.

Question No. 2

Do you find by clear and convincing evidence that, in
the granting or the retention of Dr. Merrimon Baker=s active surgical credentials, that Columbia Kingwood
acted with malice and that such conduct was a proximate cause of the occurrence
or injury in question?

 

“Clear and convincing evidence” means the measure or
degree of proof that produces a firm belief or conviction of the truth of the
allegations sought to be established.

“Malice” means an act or omission by Columbia
Kingwood:

(i)        which, when viewed objectively from the standpoint of
Columbia Kingwood at the time of its occurrence, involved an extreme degree of
risk, considering the probability and magnitude of the potential harm to
others; and








(ii)       of which Columbia Kingwood had actual, subjective awareness of
the risk involved, but nevertheless proceeded with conscious indifference to
the rights, safety, or welfare of others.

“Proximate cause” means that cause which, in a natural
and continuous sequence, produces an event, and without which cause such event
would not have occurred.  In order to be
a proximate cause, the act or omission complained of must be such that a
hospital using ordinary care would have foreseen that the event, or some
similar event, might reasonably result therefrom.  There may be more than one proximate cause of
an event.  

Answer “Yes” or “No.”

Answer:   “Yes”  

 

If you have answered “yes” as to more than one person
or entity in Question No. 1 or 2 then answer the following question.  Otherwise, do not answer the following
question.

Question No. 3

What percentage of the conduct that caused the
occurrence or injury do you find to be attributable to each of those found by
you, in your answer to Question No. 1 and/or 2 to have caused the occurrence or
injury?

The percentages you find must total 100 percent.  The percentage must be expressed in whole
numbers the percentage attributable to those named below is not necessarily
measured by the number of acts or omissions found.

a.         Columbia Kingwood   “40”  %

b.         Linda Fincher CRNA            _____  %

c.         Dr. Merrimon Baker              
“40”  %

d.         Dr. William Huie                    “20”  %

  100%

If you have answered Question No.
1 or 2 “Yes,” as to any person or entity, then answer the following
question.  Otherwise, do not answer the following
question.

 

Question No. 4

What sum of money, if paid now in cash, would fairly
and reasonably compensate Ricardo Romero for his damages, if any, resulting
from the occurrence in question?








Consider the elements of damages listed below and none
other.  Consider each element
separately.  Do not include damages for
one element in any other element.  Do not
include interest on any amount of damages you find.

Answer separately, in dollars and cents, for damages,
if any.

a.         Physical pain and mental anguish sustained in the past.

Answer:            
$250,000.00   

b.         Physical pain and mental anguish, that in reasonable
probability, will be sustained in the future.

Answer:          $5,000,000.00  

c.         Loss of earning capacity sustained in the past.

Answer:             $85,000.00   

d.         Loss of earning capacity that, in reasonable probability,
will be sustained in the future.

Answer:          $1,700,000.00  

e.         Physical and mental impairment sustained in the past.

Answer:            
$250,000.00   

f.          Physical and mental impairment that, in reasonable
probability, will be sustained in the future.

Answer:          $5,000,000.00  

g.         Medical, hospital and rehabilitation care sustained in the
past.

Answer:            $665,000.00  

h.         Reasonable expenses of necessary medical, hospital and
rehabilitation care that, in reasonable probability, will be sustained in the
future.

Answer:          $7,000,000.00  

 

Questions 5 through 8, which asked the jury to determine actual damages
to be awarded, if any, to Dolores, Joanne, and Jennifer Romero, contained the
same predicate as question 4.  Questions
9 and 10 asked the jury what amount of exemplary damages it would assess
against the Hospital and award to Mr. and Mrs. Romero.








D.        Application
of the Standard of Review to the Charge.

The parties have both addressed the recent Supreme Court
decisionCCasteelCand argued that it does or does not
apply here.  We agree with the Romeros
that Casteel does not apply, but we reach that conclusion for a
different reason than they do.  As we
explain below, we conclude the traditional harm analysis applies to this case,
so that we need not rely on Casteel. 
Below, we will first  explain why Casteel
does not apply and then we will apply the traditional harm analysis to this
case, finding that the error permeated both the liability answer and the actual
damages.  

1.         Casteel Does Not Apply.

In Casteel, the Court held that the error of
submitting a single broad-form liability question incorporating multiple
liability theories, some of which were invalid, is harmful when it cannot be
determined whether the jury based its verdict on an improperly submitted
invalid theory.  22 S.W.3d at 388.  

As the Casteel
court explained:

It is fundamental to our system of justice that
parties have the right to be judged by a jury properly instructed in the
law.  Yet, when a jury bases a finding of
liability on a single broad-form question that commingles invalid theories of
liability with valid theories, the appellate court is often unable to determine
the effect of this error.  The best the
court can do is determine that some evidence could have supported the
jury=s conclusion on a legally valid theory.  To hold this error harmless would allow a
defendant to be held liable without a judicial determination that a factfinder
actually found that the defendant should be held liable on proper, legal
grounds. 

Id.  We do not think Casteel controls this
case.  Instead, the traditional standard
of review can be applied because, unlike Casteel, we do not have to
guess if the erroneously submitted question impacted the liability or damages
answers.  We know with almost certainty
that it did impact the answers.  We
explain below.









2.         Application of the Traditional Harm
Analysis to the Charge.

In applying the harm analysis to this charge, three jury
questions control the outcome of the appeal: 
one was properly submitted, one was improperly submitted, and the third
was conditioned on the other two.  This
is where the problems lie.

Everyone agrees that the negligence claim (question 1)  was properly submitted.  But, we 
have also determined that the malicious credentialing claim (question 2)
should not have been submitted.  The
question asking the jury to assess percentages of liability (question 3) was
predicated on a finding of liability for negligence (question 1) or malicious
credentialing (question 2) or both.  

The jury found the Hospital liable for both negligence
(question 1) and malicious credentialing (question 2).  The jury also found the Hospital 40% liable
(question 3) for Romero=s injuries.  We find it
hard to believe that the 40% liability the jury attributed to the Hospital in
question 3 was not based (1) partly on the liability it found for negligence
(question 1), and (2) partly on the liability it found for malicious
credentialing (question 2).  In fact, we
find it inconceivable that the jury would find liability based on the two
different acts, but not attribute some responsibility to both acts.  It may be that 39% of the responsibility was
attributed to malicious credentialing and 1% to negligence, or that 39% was
attributed to negligence and only 1% to malicious credentialing.  Regardless, the error is present.  

The actual damages also are permeated by this problem because
the actual damages questionClike liabilityCwas predicated on the jury finding
either negligence or malicious credentialing or both.  The jury found both.  Since the question was predicated on either
or both acts, the jury was given the impression that it could base damages on
either or both acts. 








The record as a whole supports our conclusion that the jury
must have based part of the actual damages on negligence and part on malicious
credentialing.  At trial, the Romeros
focused on both the negligence and the malicious credentialing claims.  During closing argument, the Romeros asked
the jury to attribute 80% of the cause of injuries to the malicious
credentialing claim and 20% to the negligence claim.[16]

                              Summary of Discussion of Charge error








In sum, the Hospital preserved the charge issues because it
notified the Court of the problems with the charge.  In reviewing the alleged error, we agree that
the malicious credentialing claim should not have been submitted.  This error probably caused the rendition of
an improper judgment in two respects. 
First, the punitive damages are not supported by the evidence and must
be reversed.  Second, someCor allCof the percentage of liability the
jury found was based on the improperly submitted malicious credentialing
claim.  As a result, all of the actual
damages awarded are tainted with this error and must be reversed and a new
trial held on negligence.

Because of our disposition of the first issue, we need not
address the remainder of the Hospital=s issues.  

                                                                Conclusion

The judgment of the trial court is reversed and rendered on
the malicious credentialing claim, and reversed and remanded for a new trial on
negligence and damages.

 

 

 

/s/        Wanda McKee Fowler

Justice

 

 

 

 

 

 

 

Judgment rendered
and Majority and Concurring Opinions filed January 9, 2003.

Panel consists of Chief Justice Brister and Justices
Fowler and Seymore.  (Seymore, J.
concurring.)

 








Reversed and Remanded and Majority and Concurring
Opinions filed January 9, 2003.

 




 
 
 
 
 
 
 
 
 
 
 
 
 
  
 




 

 

 

 

 

 

In The

 

Fourteenth Court of Appeals

____________

 

NO. 14-00-01177-CV

____________

 

KPH CONSOLIDATION, INC. d/b/a

COLUMBIA KINGWOOD MEDICAL CENTER, Appellant

 

V.

 

DOLORES ROMERO, INDIVIDUALLY AND ON BEHALF OF

INCAPACITATED PLAINTIFF RICARDO ROMERO, AND AS NEXT
FRIEND

OF RICARDO ROMERO, JR., A MINOR, JENNIFER ROMERO

and JOANNA ROMERO, Appellees

 



 

On Appeal from the 295th District Court

Harris County, Texas

Trial Court Cause No. 98-48856

 



 

C O N C U R R I N G   O
P I N I O N

I concur with the analysis and holding in the majority
opinion but write separately in order to admonish bench and bar regarding the penchant
for broad-form submission of jury questions. 









Justice Fowler correctly concluded that Crown Life Ins.
Co. v. Casteel, 22 S.W.3d 378 (Tex. 2000), does not apply in this
case.  However, Casteel provides
some additional guidance here C that is, as the supreme court noted, ARule 277 is not absolute;
rather it mandates broad-form submission >whenever feasible.=@  Id. at 390 (quoting Tex. R. Civ. P. 277, emphasis added). 

It has become commonplace in the arena of civil litigation to
interpret Rule 277 as mandating broad-form submission.  See id. at 389 (noting Casteel=s argument that Rule 277 required a
single broad-form question); Texas Dep=t of Human Servs. v. E.B., 802 S.W.2d 647, 649 (Tex. 1990)
(interpreting Rule 277 as an unequivocal mandate for broad-form submission);
William V. Dorsaneo, II, Broad-Form Submission of Jury Questions and the
Standard of Review, 46 SMU L. Rev.
601, 603 (1992) (discussing the changing trend from discretionary to mandatory
broad-form submission).  However, as
Professor Dorsaneo notes, Aa blind adherence to the broad-form submission may make it
difficult to attain the goals that the broad-form submission was intended to
achieve, namely to reduce appeals and retrials.@ 
Dorsaneo, supra, at 603. 








The initial position of the supreme court was, Aunless extraordinary circumstances@ make submission infeasible,
broad-form questions must be asked.  E.B.,
802 S.W. at 649.  AWhenever feasible@ was defined as Ain any and every instance in which it
is capable of being accomplished.@ 
Id.  Many litigants and
trail courts have been operating under the impression that the supreme court
completely ignored Professor Dorsaneo=s warning.  However, the court took a more relaxed
position in subsequent cases.  See,
e.g., H.E. Butt Grocery Co. v. Warner, 845 S.W.2d 258, 259 (Tex. 1992); Westgate,
Ltd. v. State, 843 S.W.2d 448, 455 n.6 (Tex. 1992).  In H.E. Butt Grocery Co. v. Warner,
the court decided submitting a case in granulated-form, instead of the
broad-form Amandated@ by Rule 277, did not constitute
reversible error Abecause the charge fairly submitted to the jury the disputed
issues of fact and because the charge incorporated a correct legal standard for
the jury to apply . . . .@  Warner, 845
S.W.2d at 259.  Further, in Westgate,
Ltd. v. State, the court recognized that submitting alternative liability
standards when the governing law is unsettled might also be a situation where
broad-form is not feasible.  Westgate,
Ltd., 843 S.W.2d at 455 n.6.  While
this court=s opinion was in final stage for
issuance, the supreme court further clarified its position on broad-form
submission.  In Harris County, Texas
v. Smith, No. 01-0531, 2002 WL 31833884, at * 4, (Tex. Dec. 19, 2002), the
court reiterated the necessity for a granulated charge when a party
specifically objects to submission of valid and invalid elements of damage in a
single question.

Appellees seek damages under two legal theories:  (1) negligence and (2) malicious
credentialing.  Texas law pertaining to
malicious credentialing of physicians is somewhat unsettled.  The Texas Supreme Court first recognized the
claim five years ago in St. Luke=s Episcopal Hospital v. Agbor, 952 S.W.2d 503 (Tex. 1997).  The court iterated that negligent
credentialing was not a well-recognized, common law cause of action and
reserved deciding whether such a common law action existed.  Id. at 508.  More importantly, the court held the claim
required proof of an essential element not required of a typical negligence
claim C malice.  Id. at 509.  








The trial court properly submitted two liability questions,
separating liability for negligence from liability for malicious
credentialing.  However, the trial court
erred by submitting a single apportionment question.  In jury question number three, the court
asked the jury to allocate Apercentage of the conduct@ notwithstanding the fact that
appellees were prosecuting claims under two distinct theories of
liability.  The record reflects that the
trial court was fully cognizant of this problem and the court warned the
parties regarding the potential for error in submitting one apportionment of
liability question.  However, counsel for
appellee suggested that the supreme court favors Abroad form@ submission.  The result: this case must now be sent back
to the trial court for retrial and possibly a subsequent appeal, wasting
valuable and limited judicial resources. 
A Agranulated charge@ would have directed the jury to
separately allocate responsibility and award damages under each theory of
liability supported by evidence presented during the trial.  Such a charge would have fairly submitted to
the jury the disputed issues of fact and incorporated the correct legal
standards for the jury to apply, all the while making the questions easy for
the jury to comprehend and answer.  See
Warner, 845 S.W.2d at 259; E.B., 802 S.W.2d at 649.  More importantly, this court would be able to
determine whether there was sufficient evidence to support the verdict.

This case illustrates why bench and bar must be acutely aware
of all the reasons why Rule 277 is not absolute.  I would encourage trial courts to exercise
their broad discretion in favor of granulated-form submission, especially in cases
involving multiple theories of liability. 

 

 

 

/s/        Charles W. Seymore

Justice

 

 

Judgment rendered
and Majority and Concurring Opinions filed January 9, 2003.

Panel consists of
Chief Justice Brister, Justices Fowler and Seymore.  











[1]  The other
theory was based on negligence and alleged that the Hospital was negligent in
its delivery of blood products to the operating room. 





[2]  But, in spite
of the Hospital=s assertion of the privilege, expert testimony from
both plaintiff=s and defendants= experts
showed what information the Hospital would have known about Baker when it
credentialed himCeven though we do not know what the committee said or
did in response to the information. 





[3]  The Agbor
Court=s decision was based upon its interpretation of
sections 5.06(l) and (m) of the then-existing codification of the Texas Medical
Practice Act.  See Act of June 1, 1987, 70th
Leg., R.S., ch. 596, ' 18, 1987 Tex. Gen. Laws 2325,
2335 (repealed 1999)
(current version at Tex. Occ. Code Ann.
' 160.010 (Vernon Supp. 2002)).





[4]   The
definition of malice under section 41.001(7)(B) of the Texas Civil Practice and
Remedies Code mirrors the Texas Supreme Court’s definition of gross negligence
in Moriel.  See Moriel, 879
S.W.2d at 23.  Therefore, the case law
addressing gross negligence informs our analysis of the quality of the evidence
required to prove malice.





[5]  Additionally,
the jury charge in this case included an instruction that “[a] fact may be
established by direct or circumstantial evidence or both.”  Because the Hospital did not object to this
instruction as submitted in the charge, the evidence is reviewed in light of
the charge as given.  Bradford v.
Vento, 48 S.W.3d 749, 754 (Tex. 2001). 





[6]  The Hospital
urges us to apply the less deferential standard of review articulated in Turner
v. KTRK Television, Inc., 38 S.W.3d 103 (Tex. 2000), in which the Court
held that federal constitutional law mandated a standard of review higher than
the typical Ano-evidence@ or
legal sufficiency standard in a public figure defamation case in which actual
malice must be proved by clear and convincing evidence.  The Hospital identifies no similar
constitutional dimension in the present case; we therefore decline to apply a
heightened standard of review.





[7]  Some
exceptions exist, but they are not relevant here.





[8]  The peer
review is not only of doctors but also of other health-care providers.





[9]  Under federal
law, each entity, including an insurance company, that makes a payment under an
insurance policy, self-insurance, or otherwise, for the benefit of a physician
in settlement of, or in satisfaction in whole or in part of, a claim or
judgment against a physician for medical malpractice, must report detailed
information on the payment to the National Practitioner Data Bank.  45 C.F.R. ' 60.7
(2001).  Hospitals must request
information from the National Practitioner Data Bank at the time a physician
applies for a position on its medical staff or for clinical privileges at the
hospital, and every two years thereafter for any physician on its medical staff
or who has clinical privileges.  Id.
' 60.10(a).  A
hospital that fails to request the information as required is presumed to have
knowledge of any information reported to the Data Bank concerning the physician.
 Id. ' 60.10(b).





[10]  By letter
dated September 7, 1999, Cleveland Regional informed Baker of its final
decision to permanently suspend his privileges because of violations that
included Anumerous delinquent medical charts, failure to make
daily rounds for all patients as required . . ., and failure to enter timely
progress notes for all patients.@  





[11]  There was
evidence that, during the three years Baker was licensed in Mississippi, no
disciplinary orders were entered against him. 
There was also evidence that he had a license in good standing in South
Carolina.





[12]  Dr. Eichhorn
did testify that Baker should have been suspended from the Hospital prior to
the Romero surgery, but his testimony is vague as to when and why:  

 

Q.         (By Mr. Mithoff)  Was
Dr. Baker still on the staff at the time of the Romero surgery?

A.         Yes, definitely. 
Obviously.  He operated that day.

Q.         He had been suspended from Cleveland a couple of months
before?

A.         Yes, he had.

Q.         Is that what [the Hospital] should have done in this case?

A.         Yes, definitely.

 

Q.         And if that had been done, this tragedy could have been
avoided?

A.         He would not have been there that day doing this.

 

Dr. Eichhorn offered no basis for the opinion that
Baker should have been suspended at the Hospital other than the evidence that
he was suspended from Cleveland Regional. 
However, as we have discussed, there is no evidence that the Hospital
knew of Baker=s suspension at Cleveland Regional or the reasons for
it, and we can make no assumptions from the lack of evidence.





[13]  The Hospital
objected to this evidence as legally insufficient because (1) it was based on
insufficient data and lacked a necessary rationale, and (2) Dr. Eichhorn was
not qualified to give such an opinion. 
In response, the Romeros contend that the Hospital=s objections go to admissibility, not sufficiency, and
it waived those objections by failing to make them to the trial court.  Our resolution of the malice issue does not
require that we address this contention. 





[14]  The Romeros
did not challenge the trial court=s ruling
upholding the Hospital=s objection to this testimony.





[15]  Reversible
error is also committed if the error prevented the appellant from properly
presenting its case to the court of appeals.  Tex. R. App. P. 44.1(a)(2).





[16]  The Romeros= closing argument emphasizes that the Hospital should
bear the brunt of the liability, not the individuals listed in question 1:

 

The hospital will tell you Baker should be punished
because he held the knife and he did hold the knife, but it was the hospital
that let him hold it.  

 

He is an addict, but every addict has an enabler.  And the hospital was his enabler . . . .  I suggest to you that the overwhelming
responsibility for what happened here lies with Columbia Kingwood.

 

Now, the assessment is your own judgment, but I
suggest to you that when you take into account all of what happened with
respect to the delay in the blood and all of what happened with respect to
their awareness of the actual risks when they allowed this man to come on to
the staff and stay on to the staff, that the responsibility of the hospital
clearly exceeds 80 percent of responsibility for this tragedy.  

 

When
specifically addressing the apportionment question, counsel further explained:

 

I suggest that you simply ask yourself who was in the
best position, who was in the best position to prevent what happened to protect
Mr. Romero, to protect his family?  Was
it Dr. Baker, the addict?  Was Dr. Baker
in the best position to remove himself from the hospital staff?  Was Dr. Baker in the best position to remove
himself from operating on patients at that hospital?  He couldn=t even
admit that he had a problem.  He
certainly couldn=t quit.  

 

Were the anesthesiologists in the best position?  They were caught in the middle.  They had to depend upon Baker to control the
bleeding, stop the bleeding, and they had to depend on the hospital to get them
the blood.  

 

I suggest that the lion=s share of the responsibility, the vast
responsibility, 80 percent of the responsibility would be a reasonable
percentage to impose upon this hospital.